JUDGE PRESKA

08 CV 5591

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
NORWEGIAN BULK TRANSPORT A/S,                        :
                                                     :
                         Plaintiff,                  :            08 Civ.
                                                     :
            - against -                              :            ECF CASE
                                                     :
PIONEER NAVIGATION LTD.,                              :
                                                     :            RECEIVE
                         Defendant.                  :            JUN 20 2008
--------------------------------------------------------------X   U.S.D.C. S.D. N.Y.
                                                                  CASHIERS

## VERIFIED COMPLAINT

Plaintiff, NORWEGIAN BULK TRANSPORT A/S (hereinafter referred to as

"Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendant, PIONEER NAVIGATION, (hereinafter referred to as

"Defendant") alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under foreign law with a principal place of

business in Bergen, Norway.

3.      Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity organized and existing under foreign law with a principal place of business

in Nassau, Bahamas.

4.     By a charter party and fixture note dated February 20, 2007 on the New York
Produce Exchange charter party form, Plaintiff chartered from Defendant the M/V
BOONTRIKA NAREE for a duration of about 30/35 days for the carriage of a harmless cargo of
manganese ore in bulk. *See Recap and pro forma Charter Party attached as Exhibit 1.*

5.     As a warranty of the charter party Defendant warranted to Plaintiff *inter alia* that
the Vessel would perform at a specified speed. Materially, the recap reads "speed/cons abt 13.25
kn on about 22 mt ifo 380cst plus about 1.5 mt mdo all dts abt". That is, Defendant warranted
that the Vessel would perform at speeds of 13.25 knots while consuming about 22 metric tons of
intermediate fuel oil plus 1.5 metric tons of marine diesel oil. The foregoing description was not
qualified in any manner in the recap.

6.     Once delivered to Plaintiff, the Vessel did not perform as guaranteed by
Defendant and, in fact, grossly underperformed. In this regard, Defendant breached the charter
party by falsely warranting to Plaintiff the Vessel's capabilities.

7.     Due to the Vessel's underperformance, Plaintiff made a deduction from hire after
redelivering the Vessel to Defendant. Currently there is a dispute between Plaintiff and
Defendant concerning the quantum of hire that is due. Specifically, Defendant has presented a
claim against Plaintiff and has alleged that Plaintiff's deduction from hire was illegal: Defendant
contends that the charter party did not contain a performance guarantee notwithstanding the
warranty language in the Recap, reprinted in Paragraph 5 above. Conversely, Plaintiff has
presented a claim against Defendant in the amount of $2,579.38 for the hire balance due to
Plaintiff.

8.     Pursuant to the charter party, all disputes must to be submitted to arbitration in
London with English Law to apply.

9.      As a result of the foregoing, and in particular Defendant's refusal to abandon its hire claim against Plaintiff, London arbitration has been commenced by Plaintiff as against Defendant. In the arbitration Plaintiff is seeking a declaration of rights from the arbitrators. More specifically, Plaintiff is seeking a final arbitration award that establishes that Plaintiff's hire deduction was valid under the governing charter party and under the governing English law. Additionally, Plaintiff is also seeking an award in its favor in respect of hire in the amount of $2,379.38. Plaintiff has provided Defendant with written notice of the commencement of arbitration. Defendant has not yet appeared in the arbitration.

10.      Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Due to Defendant's unreasonable actions in continuing to pursue a baseless hire claim against Plaintiff, it became necessary for Plaintiff to seek declaratory relief from the arbitrators. If Plaintiff prevails in the arbitration, as Plaintiff expects that it will, the arbitrators will award Plaintiff its costs and fees incurred in having to bring the arbitration. As best as can be estimated, Plaintiff estimates that it will be awarded its fees and costs in the amount of $75,000.00.

11.      When its claim for legal costs in bringing the arbitration is combined with its hire claim, Plaintiff expects that it will obtain an arbitration award against Defendant in the total amount of $77,379.38.

12.      The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *See Murphy Affidavit attached as Exhibit 2*. However, upon information and belief, Defendant has, or will have during the pendency of this action, assets

3

within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

13. The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, inter alia, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$77,379.38** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

4

C.      That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court.

D.      That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

E.      That this Court award Plaintiff its attorney's fees and costs of this action; and

F.      That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

June 20, 2008
New York, NY

The Plaintiff,
NORWEGIAN BULK TRANSPORT A/S,

By: _Charles E. Murphy_

Charles E. Murphy (CM 2125)
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
cem@lenmur.com

5

## ATTORNEY'S VERIFICATION

State of New York )
                  )    ss.:    New York City
County of New York )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    June 20, 2008
          New York, NY

                                        Charles E. Murphy

6

# EXHIBIT 1

## Andrew Ridings

Subject:                    FW: Bontrika Naree recap

-----Opprinnelig melding-----
Fra: mail@granpa.com [mailto:mail@granpa.com]
Sendt: 20. februar 2007 17:23
Til: mk52
Emne: Doc-No. 867317

Doc-No. 867317 20/FEB/2007 16:22 (UTC) JENS

FROM NORMAR INTL

ATT:JAMES SHAW
CC: GG

FIXTURECONFIRMATION:

CP DATE 20.2.2007

BOONTRIKA NAREE / NET
==

PLEASED TO ADVISE MAINTERMS AGREEMENT AS FOLL:-

M/V Boontrika Naree
Sdk log/bulker ab aft
Thai flg bft 1990 Jpn
27,881mt dwat on 9.414m
Tpc loaded 39.55mt/fwa 214mm
5 holds/5 hatches
1,350,409cbft gr in mh
4x30mt cranes outreach abt 8.0m
Loa/beam 176.50m/28.00m
Grt/nrt 17,066/9,904
Speed/cons abt 13.25kn on abt 22mt ifo 380cst plus abt 1.5mt mdo all dets about

OWS CONFIRM VSL HAS NO GANTRY CRANES
OWS CFIRM VSL FITTED WITH AUSTRALIAN HOLD LADDERS OWS CFIRM VSL IS NOT FITTED WITH ANY
SUPERSTRUCTURES IN CRGO HOLDS THAT MAY HINDER LOADING/DISCHARGE DISTANCE FROM
HATCHCOAMINGS TO SHIPS RAIL - (AS PER ATTACHMENT FROM MASTER) VESSEL HAS COLLAPSIBLE
STEEL STANCHIONS #1 6.50M
#2-5 9.0M

FOR:

- ACCOUNT NORWEGIAN BULK TRANSPORT A/S

- DELY DLOSP DOUALA ATDNSHINC

- LAYCAN 22/28 FEB 07

- ONE TCT VIA SP(S) SB(S) SA(S) AA AWIWL VIA GABON TO NORWAY ONLY NOT
  NORTH OF BERGEN WITH HARMLESS CARGO OF MANGANESE ORE IN BULK ONLY
  DURATION ABT 30/35 DAYS WOG

- NAABSA NORWAY (AS PER OWS B-T-B C/P IE WHERE CUSTOMARY)

- HIRE USD 21,500 DAILY INCLOT

1

- REDELY DLOSP 1SP NORWAY NOT NORTH OF BERGEN (INT SAUDA)

- C/V/E USD 1,300/MONTH PRO RATA

- ILOHC USD 4,500 LUMPSUM

- BUNKERS ON DEL AS ONBOARD EST ABT 425/475MT IFO AND ABT 35/45MT MDO
  BUNKERS ON REDELIVERY SAME AS ONBOARD ON DELIVERY
  PRICES RENDS USD 285MT IFO AND USD 595PMT MDO

- 2.5 PCT ADDCOM PLUS 1.25 PCT NORMAR PLUS 1 25 PCT HOWE ROB LONDON

- BIMCO FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES TO
  APPLY

- OWNERS B-T-B C/P AS RECEIVED IN ATTACHMENT FROM HOWE ROB
  WITH LOGICAL ALTERATIONS AS AGREED ABOVE

ALL SUBS LIFTED

THANKS FIXTURE
REGARDS
JENS GRAN


Normar Intl. Shipping Ltd.
Phone: +44 208 9448936
Fax:  +44 208 9442867
Email: mail@oranoa.com
      mail@normar.biz

Fax sent by : 12838531178        Atlas Shipping Ltd.        82/19/07   15:48   Pg: 2/14

PCI Ref: 59?... M/V "BOONTRIKA NAREE" / PIONEER NAVIGATION CP 10/13/06

PERACO CHARTERING (USA), LLC
CLEARWATER HOUSE
2187 ATLANTIC STREET
STAMFORD, CONNECTICUT 06902

**Time Charter**

GOVERNMENT FORM

Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**ORIGINAL**

1  **This Charter Party**, made and concluded in Stamford, Connecticut  13th _____ day of October 2006 _____ 19___

2  Between _____

3  Owners of the good Their Flag _____ Steamship/Motorship "BOONTRIKA NAREE" _____ of _____

4  of 17966 _____ tons gross register, and 9964 _____ tons net register, having engines of _____ indicated horse power

5  and with hull, machinery and equipment in a thoroughly efficient state and appearance, and classed NK, NS (Bulkcarrier) MNS

6  _____ at about 1,359,409/1,327,709 _____ cubic feet grain/bale capacity available for cargo, and about 27581 metric _____ tons

7  deadweight capacity (cargo and bunkers, including fresh water and stores _____

8  allowing a sufficient of fifty tons) on a draft of 9.766 _____ feet _____

9  which are of the capacity of about _____ tons of fuel, and capable of steaming throughout the entire period of this Charter Party, fully laden, under good weather

10  conditions about 13.25 _____ knots on a consumption of about 22 metric _____ tons of Intermediate Fuel Oil (380 CST) plus about 1.5 metric tons
   Marine Diesel Oil best Welsh coal - best grade fuel oil - best grade Diesel oil (Also see Clause 52;

11  now _____

12  _____ and PIONEER NAVIGATION LTD. _____ Charterers of the City of Nassau, Bahamas

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about _____ Trading always via safe port(s), safe _____

15  berth(s), safe anchorage(s), safe places, always within IWL, always accessible, always afloat except NAABSA in customary places (Columbia-Brazil-Norway-Argentina) to be allowed provided the place is safe with soft mud which will not damage vessel's bottom/hull. Charterers' option to breach IWL against paying Owners the additional premium for such breach of IWL at per Owners' underwriters/brokers' fixed invoice net of any rebates/commission. The additional premium not to exceed Lloyds of London scale. Vessel not to force ice or follow ice-breakers, within rules mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfilment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Charterers' rights hereunder.

18  Vessel to be placed at the disposal of the Charterers, at- on dropping outward sea pilot within current C/P's redelivery range. Owners to give Charterers _____ 15/2/1 days notice of delivery date and port _____

19  _____

20  in such dock or at such wharf or place (where she may safely lie, always afloat at all times of tide, except as otherwise provided for in Clause No. 0), as

21  the Charterers may direct. If such dock, wharf or place is not available the time to count as provided for in Clause No. 5. Vessel on her delivery of latest on her arrival at first loading port after delivery, vessel's holds to be

22  ready to receive cargo with clean-swept, washed down by fresh water and dried up holds so as to receive/carry Charterers' intended cargoes in all respects free of salt, rust scale and previous cargo residues to the satisfaction of independent surveyors. In case the vessel's holds not approved by the surveyors then vessel to be placed off-hire from the time of such rejection until vessel's holds pass the same inspection again and any directly related extra expenses for cleaning holds to be for Owners' account; and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful/harmless cargoes merchan-

25  dise, including petroleum or its products in proper containers, excluding See Clause 57.

26  (vessel is not to be employed in the carriage of Live Stock, but Charterers can to have the privilege of shipping a small number on deck at their risk,

27  all necessary fittings and other requirements to be Charterers' account) in such lawful trades, between safe port and/or safe ports in British North

28  America, and/or United States of America and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29  Mexico, and/or South America, _____ and/or Europe

30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31  October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic

32  Worldwide trading excluding Israel and war/warlike zones - See also Clause 56.

33  _____

34  _____

35  at the Charterers' or their Agents shall direct, on the following conditions:

36  1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees including agency fees of the Crew, shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, cargo spaces, machinery and equipment for and during the service.

39  2.  That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Customary and Compulsory watchmen, Pilotages, Agencies, Commissions, Canal Dues,

40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

Fax sent by : 12038531178          Atlas Shipping Ltd.          32/19/87   15:46   Pg: 3/14

PCI Ref: 5797 M/V "BOONTRIKA NAREE" / PIONEER NAVIGATION CP 10/13/86

41  t sent for cargos for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew or cargoes carried prior to delivery to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while
    vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more except for illness of the crew.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or ordinary cargo, but
46  Owners to allow them the use of any dunnage and shifting boards and lashing equipment already aboard vessel. Charterers to have the privilege of using
    shifting boards
47  for dunnage, they making good any damage thereto,
48  3.  ............................................................................................................
49  ............................................................................................................
50  ............................................................................. See Clause 31.
51  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of ₤₤₤₤₤₤₤ daily including overtime...............
52  ...........................................United States Currency per ton on vessels total deadweight carrying capacity including bunkers and
53  stores on....................................barrels of ................commencing on and from the day and time of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) upon vessel being redelivered from.............................................
56  ₤₤₤₤₤₤₤₤₤₤₤₤₤₤₤₤₤₤₤₤; on dropping last outward sea pilot one safe port in Owners' option any time day or
    night, Sundays and Holidays included within the following ranges: Singapore/Japan including
    Malaysia/Indonesia/Philippines/South Korea/China; Aden/Colombo including Aden Gulf/Persian Gulf but for Persian Gulf
    redelivery to be passing Muscat outbound and for Red Sea redelivery to be passing Aden eastbound; Capetown/Natal/
    Dakar/Douala; Skaw/Mediterranean including Adriatic/UK/Eire/Black Sea and Morocco; Boston/Buenos Aires including
    ECCA, NCAS, Caribbeans excluding Cuba; Vancouver/Callao unless otherwise mutually agreed. Charterers are to give Owners not less than
    25/20/15/12/10/8/7/5/3/2/1 days
57  notice of vessels expected date or to delivery with date, and probable port/place.
58  5.  Payment of said hire to be made in New York in Owners' bankers correspondents' bank in cash in United States Currency, every 15 days
    semi-monthly in advance, and for the last 15 days balfaments or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any fundamental breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time is never than 7 a.m. on the working day
63  following this on which written notice has been given to Charterers at their offices before 4 p.m., and if required by Charterers, they
64  to have the privilege of using vessel in more, such this could two ton hire.
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6.  That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place in port, or safe anchorage(s) that
    Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for the ship to lie safely to ground
70  (is agreed).
71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as vessel can accommodate. Charterers
74  paying Owners..............................per day per passenger for accommodation and victualling. However, if it is agreed that in no way Owners can take passengers as
75  the need is the consequences of the carriage of passengers, Charterers are to indemnify this and expense.
76  8.  That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim, discharge, lash, unlash, dunnage, secure, unsecure, tally, draft survey the cargo at their
    expense under the supervision of the Captain, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's and/or Tally Clerk's receipts.
80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same and, if necessary, make a change in the appointments.
82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall, subject to availability of lifeboat capacity/accommodation
    and signing Letter of Indemnity in Owners' P & I Club format/wordings, accompany the vessel and see that voyages are prosecuted
83  with the utmost dispatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84  rate of USD 10.00 $4.00 per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying ₤₤₤₤₤₤₤ (One Thousand Two Hundred Dollars) lumpsum per month/pro rata
    including cables, victualling, entertainment and representation. With owners co-operation, for all such victualling.
86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily deck and engine Logs in English, showing the course of the vessel and distance
    run and the con-
89  sumption of fuel.
90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13.  That the Charterers shall have the option of cancelling this charter for a further period of............................................
92  ............................................................................................................
93  on giving written notice thereof to the Owners or their Agents.............................days prior to the expiration of the first named term, or any earlier to before.
94  14.  That if required by Charterers, time not to commence before........................................and should vessel

Fax sent by  : 12038531170      Atlas Shipping Ltd.       92/19/87  15:45    Pg: 4/14

*PCI Ref: 5797 M/V "BOONTRIKA NAREE" / PIONEER NAVIGATION CP 10/13/06*

95   use have given written notice of *delivery* readiness on or before ...................................................... before hand-
96   their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
77   16. Text in the event of *defiency and/or default* of owe or *deficiency* of stores, fire, breakdown or damages to hull,
98   machinery or equipment,
99   grounding, detention by average accident to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
100  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
101  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
102  thereof, and all extra expenses shall be deducted from the hire.
     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard off) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105      The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.
107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *Arbitration as per Clause 57*, three
     persons at New York,
108  one to be appointed by each of the parting hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.
110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the Owners in the vessel.
114  19. That all derelict and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15 inclusive, 17 to 22, inclusive and Rule V of
116  York-Antwerp Rules *1994* 1924, at such port or place in the United States or may be selected by the carrier, and as to matters not provided for by
     these

117  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118  United States money at the rate prevailing on the dates made and allowances for damage in cargo claimed in foreign currency shall be converted at
119  the rate prevailing on the date of discharge made on the date of such disbursement. Such discharge of such damage to the ship. Average agreements or
120  bonds and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Average agreements or
121  the for goods may from sufficient on additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123  carrier, be payable in United States currency and to be made by the carrier. When no amount the deposit shall be held in a special account at the
124  place of adjustment in the name of the carrier covering with the General Average and salvage of such balances, if any, shall be paid to the
125  United States money. Hire not to contribute to General Average.
126  In the event of accidents, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,
127  whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the
128  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129  losses, or expenses, of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the
130  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131  ships belonged to strangers. See New Jason Clause as attached.
132     Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133  20. Fuel used by the vessel while at off hire, also for cooking, condensing water, or for grates, and stores to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.
135  21. That in the vessel may at, from, time to time, employed in tropical waters during the term of this Charter, Vessel is to be docked, at a
136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, ordering from
137  time of her existing, and payment of the hire to be suspended until she is again in proper state for the service.
138  Owners shall have the option to place the vessel in drydock during the currency of this Charter at a convenient time/place to
139  be mutually agreed always within the time frame of class requirement and/or demands of circumstances for bottom cleaning
     and painting and/or repairs as required by Class or dictated by circumstances. Payment of hire shall be suspended upon
     deviation from Charterers' services until vessel is again placed at Charterers' disposal at a point not less favorable to Charterers
     than when the hire was suspended. Owners to give not less than 90 days notice if intended drydock as well as intended country;
     Charterers to keep Owners advised of vessel's schedule/itinerary as fast as possible.
140  22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes derricks at all times) capable of handling lifts up to maximum
     in accordance with Description Clause, above.
141  providing ropes, falls, slings and blocks as on board. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the sufficient lights vessel lanterns and oil for
143  night work  . and vessel to give use of electric light when so fitted, but any additional lights over there-on board or as of Charterers expense. The
144  Charterers to have the use of any gear on board the vessel.
145  23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging
146  master to provide one winchdriver per hatch to work winches day and night if required. Charterers agreeing to pay officers, engineers, watchmen
147  dock hands and deckmen's for overtime work done in accordance with on working hours and over speed in the ratio scales. If the ratio of the
148  port or labor unless grooms crew from driving winches, shore cranemen Winchmen to be employed and paid by Charterers, in the event of a disabled
     cranewinch or cranes winches, or
149  insufficient power to operate winches cranes, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby. If Owners pay for shore engine or engines, then vessel to remain on-hire provided such shore engine(s) is(are) able to
     keep the same discharging rate as the vessel's crane(s) when such crane(s) is(are) in good working condition.
151  24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels
153  etc.", in respect of all merchandise carried, this charter as on from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:

Fax sent by  : 12838531170        Atlas Shipping Ltd.        02/19/07   15:46   Pg:  5/14
(17/7/2006 iuE 16:03  FAX  523500

PCI Ref: 5797 M/V "BOONTRIKA NAREE" / PIONEER NAVIGATION CP 10/13/06

155
156                                    U.S.A. Clause Paramount
157     ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
158     ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
159     ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
160     ~~be repugnant to said Act to any extent, such term shall be void to that extent but no further.~~
161                              ~~Both-to-Blame Collision Clause~~ See New Both-to-Blame Collision Clause as attached.
162     ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163     ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
164     ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
165     ~~or liability represents loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
166     ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
167     ~~owners as part of their claim against the carrying ship or carrier~~
        25.  The vessel shall not be required to force ice or to follow ice breaker or to enter any ice-bound port, or any port where lights or light-ships
        have been or are about to be with-
168     drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169     port or to get out after having commenced loading or discharging See Clause 76.
170        26.  Nothing herein stated is to be construed as a denial of the vessel to the Time Charterers. The owners to remain responsible for the
171     navigation of the vessel, acts of pilots, insurance, crew, and all other matters, same as when trading for their own account.
172        27.  A commission of 1.25% 3-1/2 per cent is payable by the Vessel and Owners to
173     PERACO CHARTERING (USA) LLC ............................................................................................
174     on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175        28.  An address commission of 3.75% 2-1/2 per cent payable to Charterers........................................ on the hire earned and paid under this Charter.

Additional Clauses 29 to 87, Binco Standard War Risks Clause for Timecharters - Code Name: "Conwartime 1993", New
Jason Clause, General Clause Paramount and New Both-to-Blame Collision Clause, all as attached, to be deemed part of and
incorporated in this Charter Party and all the Bills of Lading issued hereunder.

OWNERS:                                          CHARTERERS:

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.) Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

Fax sent by  : 12838531178
11/07/2006 TUE 15:09  FAX  DERACO          Atlas Shipping Ltd.          82/19/87  15:45   Pg: 6/14

FCL Ref. 5797

Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford, Connecticut October 13, 2006

29.   Master/Owners to keep Charterers well advised of vessel's readiness to deliver. Owners to give Charterers 15/12/10/8/7/5/3/2/1 days notice of delivery date and port.

30.   Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates, approvals, equipment and fittings, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and to receive bunkers within the trading limits of this Charter Party, even where such certificates, approvals, equipment and fittings, become necessary before or after the commencement of this Charter Party.

It is the responsibility of the Master and the Owners to arrange for any special vaccination required at ports of call and to keep on board corresponding valid certificates.

If Owners fail to comply herewith, any time lost and all extra expenses to be for Owners' account and Charterers may deduct same from the hire.

31.   Upon delivery, the vessel shall have on board an International Tonnage Certificate valid for the duration of this Charter Party.

32.   I.T.F./Flag Restriction, Etc.
Owners warrant that the officers and crew of the vessel are covered for the duration of this Charter Party by an I.T.F. Agreement or other Bona Fide Trade Union Agreement conforming to I.T.F. standards acceptable worldwide. Loss of time and extra expenses incurred as a result of non-compliance shall be for Owners' account and may be deducted from hire.

The Owners are responsible for any loss of time or delay or restriction to the full working of the vessel resulting from any action that may be taken against the ship and/or the Owners by third parties for any reason whatsoever unless same is caused by neglect or omission or fault of the Charterers and/or their Agents. Any time lost as a consequence of any such action by third parties shall be considered as off-hire and shall be deducted from the hire.

Any extra expenses resulting directly from such action shall be the responsibility of and paid for by the Owners or, in Charterers' option, shall be paid by the Charterers and provided Charterers have substantiated that such extra expenses have been incurred as a direct consequence of such I.T.F. action shall be deducted from the hire.

Owners warrant that the vessel is not blacklisted by any country within the trading limits of this Charter Party.

33.   Owners warrant to provide for the vessel and maintain at their expense and carry on board the vessel a valid U.S. Coast Guard Certificate of Financial Responsibility as required under the U.S. Federal Water Quality Act and amendments thereto. Owners also warrant to have secured current certificates for other countries where similar guarantees are required. In no case shall Charterers be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates or the Owners' non-compliance with present or future water pollution legislation enacted by individual U.S. States or other countries. Time lost by non-compliance to be considered as off-hire.

- 1 -

PCL Ref: 5797
Additional Clauses to M/V "BOGNTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 23, 2006

34.    P. and I. Club / Cargo Claims:
Owners guarantee that the vessel is entered and shall remain entered in a Protection
and Indemnity Association for the duration of this Charter Party. Entry shall
include, but not be limited to, full cover for cargo claims of any nature.

Vessel is presently entered with U.K. P. and I. Club.

Cargo claims as between the Owners and the Charterers shall be settled in
accordance with the Inter-Club New York Produce Exchange Agreement of February
1970, as amended May 1984 and September 1996, or any subsequent modification or
replacement thereof. The party having paid the claim(s) shall submit same to the
other party with supporting documents as soon as possible, and neither party shall
between themselves refer to the 2 (two) years time limit as defence.

35.    Liability Insurance:
The Charterers shall not be responsible for loss of life nor arrest or seizure and/or
other objects arising from perils insured against by customary policies of insurance
so far as the insurance policy rules permit and provided same not caused due to the
act, neglect, default of Charterers and/or sub-Charterers or their servants/Agents.

36.    Trading Exclusions:
Vessel to be employed in lawful trades for the carriage of lawful and harmless
merchandise only between safe ports where vessel can safely lie always afloat and
trading to be always within IWL but always specifically excluding Yugoslavia,
Bosnia, Albania, Israel, Lebanon, Turkish occupied Cyprus, Libya, Zaire, Somalia,
Iraq, N. Korea, Srilanka, Campuchea, Angola, Cabinda, Cuba, Liberia, Sierra Leone,
Abkhazia, North & South Yemen, Belize, CIS Russian Far East, Georgia (Black
Sea), Cameroon, Ethiopia and Eritrea, Amazon River, St. Lawrence River trading is
okay if no ice but no trading West of Montreal and no Great Lakes. In case of trading
to St. Lawrence waterways, but not west of Montreal (no Lakes trading) Charterers
to procure and pay for all ice advisories for navigation of vessel in St. Lawrence
including all pilotages/tugs and additional ice levies and navigational dues as
applicable and charged by St. Lawrence waterways. Vessel not required to
force ice. If vessel has to follow an ice breaker then not to be the first vessel
or the last vessel in the ice convoy. If on account of ice the Master considers
it dangerous to remain at the loading or discharging port, area/place for fear of the
vessel being frozen in and/or damaged, he has liberty to sail to a
convenient open safe place and await Charterers fresh instructions. It is
understood that the Vessel remains on hire during such period. If any breach of
IWL applicable for trading in St. Lawrence to be for Charterers account

Countries/places where U.N./U.S.A. sanctions and/or restrictions are in force and
all war and/or warlike zones. Orders of Owners war risk underwriters are always to
be followed.

Angola, Liberia, Sierra Leone, Cameroon, Ethiopia and Eritrea to be considered
allowed by Owners on a case by case only and always subject to Owners' prior
approval, which not to be unreasonably withheld.

-2-

PCL Ref: 5797

Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 18, 2006

35.    Trading Exclusions: (continued)
Basic war risk insurance to be for Owners' account. Any additional premium (which
to be arranged by Owners) for hull and machinery and officers/crew for trading to a
restricted area, including blocking and trapping insurance and crew war bonus to be
for Charterers' account and vessel to remain on full hire.

When trading to West African ports Charterers to provide armed guards during port
stays in these countries to protect the vessel, her crew and her cargo. When trading to
West African ports Charterers to first handle all cargo claims from third parties in
these countries, including putting up securities, if necessary, to prevent
arrest/detention of the vessel or to release the vessel from such arrest/detention.
Eventual claims to be settled between Owners/Charterers as per NYPE Interclub
Agreement as per Clause 34 in proforma CP.

Bangladesh and Yemen trading allowed but cargo shortage claim if any to be
handled by Charterers, including putting up security, if necessary, to prevent
arrest/detention of the vessel or to release the vessel from arrest/detention, and
vessel to remain on hire, eventual claims to be settled between Owners and
Charterers as per NYPE Interclub Agreement as per Clause 34.

Iraq permitted to trade but always subject to actual condition prevailing in Iraq with
Charterers paying for all additional war risk insurance as applicable and Charterers
to follow Owners' war risk underwriters' orders.

37.    Cargo Exclusions:
The following cargoes are excluded:

Livestock, radio and radioactive goods and its wastes, nuclear products, petroleum
and its products, asphalt, pitch, ammonium nitrate, turnings, motor blocks,
quebracho, hides, acids, explosives, arms, ammunitions, direct reduced iron ore
pelics, inflammable goods, dangerous and injurious cargoes, creosote and creosoted
goods, sponge iron, black powder, blasting caps, tar, shavings, HBI saltpeter, Chilean
nitrate of soda (but fertilizer grade always allowed subject same not coming under
IMDG Code), quick lime, naphtha, calcium carbide, borax, silicon magnesium,
turpentine, carbon black, asbestos, calcium hypochloride, bitumen, detonators,
bombs, dynamite, war materials, caustic soda, expellers, fishmeal, ferrosilicon, copra,
scrap, sulphur, IMO/IMDG cargoes.

If concentrates are loaded, same to be loaded, stowed, carried and discharged
strictly in accordance with IMO and local rules and recommendations - after
discharging this cargo Charterers are to clean vessel's holds at their time and
expense to same condition as prior loading  this cargo. If concentrates are loaded,
the moisture content of same to be within IMO transportable limits, and certificates
to be issued to this effect by an independent surveyor at the time of
shipment.  If concentrates are loaded then the rate for intermediate hold
cleaning by crew to be USD 3850.00 per hold.

- 5 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

37.    Cargo Exclusions: (continued)
Chrome ore not to be last 3 cargoes prior to redelivery.

Charterers may load two cargo of non-oily shredded PIMS 1 + 2 scrap per
year, always excluding MBT. Same is to be loaded with following soft landing
clause - no other type/form of scrap to be permitted.

Soft Landing Clause:- Charterers/sub-Charterers and/or their
stevedores/servants are to lower the Cargo down softly, as close to the tanktops
as possible, or, the tanktops until a layer of cargo is built up at least to be about 2
(two) meters height over the entire tank top area before proceeding to load in the
normal manner. Master has the right to stop loading should stevedores/other
loading personnel fail to comply with above and/or endanger the vessel and/or her
equipments/fittings at any stage of loading. If shredded scrap is loaded then the rate
for intermediate hold cleaning by crew to be USD $850.00 per hold.

Charterers may load two salt cargos per year. Same to be loaded, stowed,
carried and discharged strictly in accordance with IMO and local rules and
recommendations.

Charterers are to lime wash vessel's holds at their time and expense prior
loading salt and after discharge Charterers are to clean vessels holds to same
condition as prior loading the cargo at their time and expense. Charterers' option to
request crew assistance for lime-washing of holds and removal of lime-wash against
paying Owners USD $600.00 per hold for each such lime-wash/removal in addition
to the rates stipulated in the intermediate hold cleaning clause in this Charter Party.
Crew to perform lime-washing of holds and removal of lime-wash provided
shore/local/labour regulations and weather conditions permitting and always at
Charterers' risk, time and costs. Charterers to provide lime at their time and
expenses. Vessel/Owners/crew not responsible/liable in the event vessel fails
subsequent hold inspections and for any consequences whatsoever resulting from
this arrangement.

Charterers may load two sulphur cargoes per year. Same to be loaded, stowed,
carried and discharged strictly in accordance with IMO, flag state
and local rules and recommendations including but not limited to all Solas
regulations together with any and all protocols/amendments thereto. . Charterers
are to lime wash vessel's holds at their time and expense prior
loading sulphur and after discharge Charterers are to clean vessels holds to
same condition as prior loading the cargo at their time and expense.
Charterers' option to request crew assistance for lime-washing of holds and removal
of lime-wash against paying Owners USD $600.00 per hold for each such lime-
wash/removal in addition to the rates stipulated in the intermediate hold cleaning
clause in this Charter Party. Crew to perform lime-washing of holds and removal of
lime-wash provided shore/local/labour regulations and weather conditions
permitting and always at Charterers' risk, time and costs.  Charterers to provide
lime at their time and expenses. Vessel/Owners/crew not responsible/liable in the
event vessel fails subsequent hold inspections and for any consequences
whatsoever resulting from this arrangement.

- 4 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 19, 2005

37.   Cargo Exclusions: (continued)
      Charterers have the option to load two cargoes of cement per year.
      If cement is loaded then the rate for intermediate hold cleaning by crew to
      be USD $950.00 per hold.

      With the view to protect Owners and Charterers against possible claims for
      cargo damages, the Owners have the option to appoint surveyors nominated by
      their P and I club to perform cargo condition surveys concurrently with
      loading and discharging certain cargoes such as steel, and other cargoes
      which are potentially liable to cargo claims. Cost for such surveys to be shared
      equally between Owners and Charterers.

      Deck cargo clause:
      Charterers are entitled to load cargo on deck in accordance with normal marine
      practice and safety regulations and always subject to vessel's seaworthiness,
      strength, stability and safety of crew. Deck cargoes to be entirely at
      Charterers'/Shippers'/Receivers' risk, time and expense. Deck cargoes to be
      loaded, stowed, lashed and secured to master's satisfaction. Extra expenses and/or
      detention/deviation if any due to deck cargoes to be for Charterers' account. All
      Bills of Lading for deck cargoes to be claused "Shipped on deck at Charterers',
      Shippers' and Receivers' risk, expense and responsibility, without any liability on
      the part of the vessel or her Owners for any loss, damage, expense and/or delay
      howsoever caused. Charterers can make any and all fittings required for loading
      deck cargo. All fittings to be made according to class recommendations.

      Charterers' option to load during this Charter Party, maximum up to four cargoes of
      calcined petcoke (Calcined only, all other petcoke vis green/delayed is excluded in
      this Charter Party), each 12 months on the condition that Charterers undertake to
      pay Owners USD $1,000 per hold for each intermediate cleaning performed by crew
      after having loaded the calcinated petcoke. Charterers to supply chemicals to
      wash/clean vessel's holds after calcined petcoke carriage to prepare holds for the
      next cargo .

      Charterers allowed to load 'chrome ore' but not as the last three cargoes prior
      redelivery.

      Logs Loading Clause:
      In the event Charterers load logs the following clauses to apply:

      Charterers are to load, stow, lash/unlash, secure, dunnage, tally and discharge the
      cargo free of risk and expense to the vessel/Owners.

      The Master shall supervise the stowage of the cargo and direct/control all
      loading, handling, stowing and discharge of the cargo.

      The vessel is to be loaded in accordance with the vessel's timber deck cargo loading
      manuals and IMO code of safe practice for ships carrying timber deck cargoes,1991.
      Such deck and/or hatch cargo is to be carried at Charterers' risk and is never to · · ·

- 5 -

PCL Ref: 5797

Additional Clauses to M/V "BOONYRIKA NAREE" Charter Party dated Stamford, Connecticut October 13, 2006

37.    Cargo Exclusions: (continued)

exceed the vessel's deck and/or hatch strength. Any deck and/or hatch cargo is always to be carried consistent with vessel's stability and loading manuals and stowed, lashed and secured under the supervision of the Master and to Master's satisfaction.

If requested by Charterers and provided local/shore/labour regulations and weather conditions permit, vessel's crew to perform setting up/down stanchions and lashing/unlashing /relashing/mark off (materials and equipment for mark offs to be supplied by Charterers at their expense) of cargo and these extra services to be performed by vessel's crew entirely at Charterers' risk, expense and vessel to remain fully on hire, Charterers to pay Owners USD $4,000.00 lumpsum for these extra services by crew.

Bills of Lading for deck and hatch cargo are to be claused - "Carried on deck/hatch covers at Charterers'/Shippers'/Receivers' risk and expense without any liability on the part of the vessel/Owners for any loss and/or damage howsoever caused."

If logs are loaded then the rate for intermediate hold cleaning by crew to be USD $1,000.00 per hold.

38.    Bunkers:

Bunker on delivery about ▓▓▓▓▓ metric tons Intermediate Fuel Oil and about ▓▓▓▓ metric tons Marine Diesel Oil

Bunker prices U.S. ▓▓▓▓ per metric ton for Intermediate Fuel Oil and U.S. ▓▓▓▓ per metric ton for Marine Diesel Oil.

Owners are allowed to bunker the vessel on their account at load port or en route without interfering with Charterers' operation, last voyage only.

Charterers to pay for the value of bunkers on delivery with first hire payment.

Charterers may deduct value of estimated bunkers on redelivery from last sufficient hire payment(s). Owners have the privilege to bunker the vessel for their own account during the last or penultimate voyage of this Charter without interfering with Charterers' operations.

39.    Weather Routing:

The Charterers may supply an independent Weather Routing Companies advice to the Master during voyages specified by the Charterers. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and the weather routing companies' reports. In the event of a consistent discrepancy between the deck logs and the weather routing companies' reports, the latter shall be taken as ruling. In the event of any speed claims fuel savings, if any, due to reduced speed is to be considered and set off as credits against such claims. Charterers to provide supporting documents to substantiate their speed claims if any and same to be dealt with separately.

- 6 -

Fax sent by : 12039591178          Atlas Shipping Ltd.          02/19/87  15:46   Pg: 12/14

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2005

40.     Master's / Crew's Assistance:
        With reference to Clause 8 of this Charter Party, "customary assistance" shall mean
        all types of work which the Master and the crew would normally do when the ship is
        trading for the Owners' account such as, but not limited to:

        A)      All opening and closing of hatches, when and where required, if permitted by
                local regulations.
        B)      Deleted.
        C)      Deleted.
        D)      Warping alongside berths whenever required.

        The Master shall be responsible for all gear, equipment and/or stores supplied to the
        vessel by or for Charterers' account and the Master shall keep a record of all such
        gear, equipment and/or stores to be redelivered to the Charterers prior to redelivery
        of the vessel to the Owners or if required by the Charterers, at any time during the
        Charter in like good condition as supplied, fair wear and tear always excepted. The
        Owners shall make good any shortage and/or damage unaccounted for.

41.     Bill(s) of Lading:
        With reference to Clause 8, it is understood that the Charterers and/or their Agents
        may sign Bill(s) of Lading on Master's behalf provided same are in conformity with
        Mate's receipts, quantity loaded/discharged to be determined by draft survey.
        Through or in-Transit or Liner Bills of Lading not to be issued under this Charter
        Party. Neither the Charterers nor their agents shall permit the issue of any Bill of
        Lading, Waybill or other document evidencing a contract of carriage (whether or not
        signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-
        Charterers) incorporating the Hamburg Rules or any other legislation imposing
        liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify
        the Owners against any liability, loss or damage which may result from any breach
        of the foregoing provisions of this Clause.

42.     Supercargoes / Port Captains:
        The Charterers or their Supercargo(es) are entitled to call for speed trials, in ballast or
        loaded condition, indemnifying the Owners for any extra expenses in this
        connection. The Charterers and/or their supercargo(es) may install and remove, at
        their expense, such instruments as may be required to check the vessel's speed and
        revolutions of the main engine.

        The Charterers and/or their Supercargoes shall have free and unlimited access to the
        whole vessel including bridges, holds and engine room, and also to all vessel's tanks,
        including but not limited to, bunkers, lubricating oil, sludge, ballast and fresh water
        tanks. Whenever required, the Master must bring the vessel into even trim to ensure
        correct bunker soundings.

        The Charterers and/or their Supercargoes shall have free and unlimited access to the
        whole vessel including bridges, holds and engine room, and also to all vessel's tanks,
        including but not limited to, bunkers, lubricating oil, sludge, ballast and fresh water
        tanks. Whenever required, the Master must bring the vessel into even trim to ensure
        correct bunker soundings. The Charterers' and/or surveyors to have free and

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NARBE" Charter Party dated Stamford,
Connecticut October 13, 2006

42.   Supercargoes / Port Captains (continued)
unlimited access to the vessel's deck and engine log books, tank plans, calibration
scales and/or other plans as requested and are allowed to make copies of the original
log books on board or ashore.

Charterers have the right to inspect the vessel and do a full survey.

43.   If the Charterers have reason to be dissatisfied with the performance of the vessel,
the Owners, upon receiving complaints shall immediately investigate and take
appropriate steps to correct the situation.

44.   Stevedore Damages:
Charterers to be responsible for all damages caused to the vessel and/or her
equipments by stevedores and/or Charterers servants / Agents. Master to notify
Charterers or their Agents in writing / telex / cable of such damage within 24
(twenty-four) hours of occurrence, or in case of hidden damage as soon as practicable
after discovery of same but in any case prior to redelivery of the vessel.

Master to co-operate with Charterers or their Agents in notifying the party who
caused the damage and to hold them responsible. If requested by Charterers, Master
to co-operate with the Agents to arrange for a survey at Charterers time and expense
to define, estimate the extent of damage. Damages which affects vessel's
seaworthiness and/or class and/or working / trading capacity and/or safety of
crew to be repaired by Charterers without delay after each occurrence in Charterers'
time and costs. Such repairs to be carried out to class surveyor's approval.

Damages which do not affect vessel's seaworthiness and/or class and/or working /
trading capacity and/or safety of crew may be repaired during vessel's next regular
drydock concurrently with Owners work and Charterers to pay Owners the repair
costs against vouchers and also for the time (insofar as the time exceeds the time
necessary to carry out Owners work). Charterers have the right to be represented at
the time of repairs in drydock. Owners to give Charterers reasonable notice of same
as far as possible.

45.   Off-Hire:
After suspension of hire from any cause, the vessel shall be placed at Charterers'
disposal at the same port or position where hire was suspended.

During any off-hire period estimated to exceed 5 days, the Owners to give the
Charterers not less than 2 (two) days definite notice of resumption of the service.

If the vessel has been off-hire for a period of 30 (thirty) consecutive days during this
Charter, the Charterers are at liberty to cancel the balance period of this Charter
Party and redelivery shall take place upon vessel being free of cargo.

46.   Punctual Payment / Breach of Charter
Before exercising the option of withdrawing the vessel from the Charter, the Owners
will give the Charterers 72 (seventy-two) hours, (Saturdays, Sundays and Holidays
excluded) official notice in writing, and will not withdraw the vessel if the hire is

- 8 -

Fax sent by : 12638531178          Atlas Shipping Ltd.          02/19/07    15:46    Pg: 14/14

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 15, 2005

46.    Funeral Payment/ Breach of Charter: (continued)
       paid or the alleged breach is rectified within the 72 (seventy-two) hours allowed for
       notice from the time the Charterers received such notice.

       The Charterers have the liberty to retain sufficient funds from any hire to cover
       actual amounts, including substantiated off-hire and value of substantiated bunkers
       on redelivery, for Owners' account.

       Owners warrant that the Master will have sufficient cash on board the vessel to pay
       Agents for all Owners' husbandry items and therefore Charterers will not deduct any
       funds to cover any alleged estimated Owners' items.

47.    Deleted.

48.    Speed:
       The Charterers may instruct the vessel to steam within the capabilities of vessel's
       main engine. With reference to Lines 9 and 10 of this Charter Party, good weather
       conditions is understood to mean all weather conditions not exceeding wind force
       Beanfort 4.

49.    Lieu of Cleaning on Redelivery:
       With reference to Line 54, the Charterers have the liberty to redeliver the vessel with
       unclean holds paying the Owners a lumpsum of U.S.~~——————————~~ and ~~——————————~~
       lumpsum in case last cargo is logs in lieu of cleaning including disposal
       dunnage/lashing materials/debris. However, if disposal of dunnage/lashing
       materials/debris by shore labour obligatory then same to be arranged and paid by
       Charterers.

50.    Intermediate Hold Cleaning Clause:
       Intermediate hold cleanings to be performed by Charterers at their risk, time and
       costs. However if requested by Charterers crew to perform same, provided
       shore/local/labour regulations and weather conditions permitting, at Charterers'
       risk, time and costs but vessel/Owners/crew not responsible/liable in the event
       vessel fails subsequent hold inspections. Charterers to provide the required materials
       for cleaning holds including fresh water. Charterers to pay owners ~~——————~~ per
       hold for sweeping only and ~~——————~~ per hold for sweeping and washing, for
       each such intermediate hold cleaning performed by crew.

       Throughout the currency of this Charter Party the Charterers shall remain
       responsible for all costs and time, including deviation, if any, associated with the
       removal and disposal of cargo related residues and/or hold washing water and/or
       chemicals and detergents and/or waste as defined by Marpol Annex V, Section 1 or
       other applicable rules relating to the disposal of such substances except on redelivery
       where ILOHC applies

Fax sent by : 12038531178          Atlas Shipping Ltd.          02/19/87   15:56   Pg: 2/15
11/07/2006 TUE 14:14  FAX  pcface . ........  ...      ...     ... . .. ...

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

51.   Fittings:
      Charterers to have the option to weld padeyes and/or other lashing / securing
      devices / points at their expense and subject to the Master's approval which not to
      be unreasonably withheld. Charterers to remove all such padeyes and/or other
      lashing / securing devices / points prior to redelivery if required by Owners.

52.   Vessel's Description:
      (All details 'about', and without guarantee given, in good faith)

      M.V. BONTRIKA NAREE Vessel description to be attached as follows:
      BUILT 18 DECEMBER 1990 AT KANASASHI SHIPBUILDING CO., JAPAN
      EX NAMES, "PORT STAR". TYPE LOG/BULKER
      FLAG: THAI, POR: BANGKOK OFFICIAL NO. 4010 00641, IMO NO. 8914738
      CALL SIGN - HSPDZ
      INMARSAT C TLX: 456718710 INMARSAT A: 1567156
      CLASS - NK NS (BULK CARRIER) MNS NO: 903082
      DWT / DRAFT
      SUMMER:          27881 MT / 9.414 M
      WINTER:              27107 MT / 9.218 M
      TROPICAL:        28657 MT / 9.610 M
      LUMBER SUMMER: 28908 MT / 9.673 M
      LUMBER WINTER:  27845 MT / 9.405 M
      LUMBER TROPICAL:    29707 MT / 9.874 M
      LOADED TPC - 39.55 MT FWA: 214 MM
      LOA -176.60/LBP-169.40 / BEAM-26.00M/MOULDED DEPTH - 13.30 M
      AIR DRAFT FM KEEL- 41.0 M
      GT/NT - 17066 / 9904
      SUEZ GT/NT - 17524.66 / 15719.33
      (SCNT DURING ONE OF HER TRANSIT WAS 16401.28 SCID NO: 23659 SINCE
      SUEZ CANAL NT DEPENDS ON VARIBLE FACTORS CHARTS TO CONFIRM
      WITH THEIR AGENTS FOR THE ACTUAL SCNT FOR THE TRANSIT)
      PANAMA NT: 14283, PANAMA SIN NO. 969528
      HO/HA - 5/5, GEAR - 4 CRANES OF 30 MT EA. OUTREACH
      ABOUT 8.0 M
      HATCH OPENINGS -
      NO.1: 17.94 X 12.90
      NO.2: 19.50 X 17.82
      NO.3: 19.50 X 17.82
      NO.4: 19.50 X 17.82
      NO.5: 19.50 X 17.82
      HATCHCOVERS - FOLDING TYPE -HYDRAULIC
      GRAIN / BALE - IN CBFT - 1,360,409 / 1,317,709
      CUBIC BREAKDOWN -
      GRAIN NO 1 - 225, 372/2 - 288, 045/3 - 288, 420/4-288, 429/5 -260. 153
      BALE NO 1 - 220, 903/2 - 280, 658/3 - 281, 484/4 - 280, 979/5 - 253, 685
      HOLD DIMENSIONS (L X B (F, A) AT TANKTOP X HT UP TO COAMING IN MTERS)
      (ALL ABOUT)
      NO. 1, 27, 58 X 4.99, 19.55 X 11.75 M

- 10 -

Fax sent by  : 12838531178          Atlas Shipping Ltd.          82/19/37   15:56   Pg: 3/15
11/07/2006 TUE 15:15  FAX  ページ

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

52. Vessel's Description (continued)
NO. 2 3 AND 4 27.58 X 19.6 X 11.75 M
NO. 5 27.75 X 19.60. 7.52 X 11.78 M
HEIGHT OF HATCH COAMING: ABOUT 1.9M
STEEL STANCHIONS
COLLAPSEBLE: #1 - 6.50 MTRS HIGH #2, 3, 4, 5 - 8.0 MTRS HIGH
AUSSIE FITTED, GRAIN FITTED, LOG FITTED
STRENGTHS - IN MT / M2
MAIN DECK - 4.0 MAIN DECK HATCHES - 3.0, TANKTOP - 15.00
SPEED CONSUMPTION -
ABOUT 13.25 KNOTS ON ABOUT 72 MTS IFO 380 CST + 1.5 MTS MDO
IN PORT IDLE/WWW - ABOUT 1.5 MTS MDO / ABOUT 2.5 MTS MDO
ABOVE SPEED WARRANTY FOR GOOD WEATHER UP TO BEAUFORT
WIND FORCE 4 AND DOUGLAS SEA STATE 3
VESSEL CONSUMES MDO IN MAIN ENGINES WHILE MANOUVERING
IN/OUT OF PORTS, CANALS, RIVERS, NARROW WATERS, FOGS, ETC.
BUNKER SPECS:
FUEL OIL 380 CST SPECS: ISO 8217; 1996 ISO-F-RMG35
DIESEL OIL SPECS 380 CST SPECS: ISO 8217; 1996(E) ISO-F-DM3
P & I CUUB - U.K. P N I CLUB / H+H VALUE - USD 12.50 MILLION
OWNERS: PRECIOUS OCEANS LIMITED, BANGKOK
IF VESSEL LOADS TO FULL DWT CAPACITY WITH HIGH DENSITY
CARGOES (I.E. CARGOES STOWING LESS THAN 55 CFT/MT), THEN
VESSEL TO BE LOADED HOMOGENEOUSLY.
CHARTERERS TO HAVE THE RIGHT TO DO A FULL CONDITION SURVEY.
OWNERS TO GIVE ALL ACCESS AND ASSISTANCE TO CHARTERERS INSPECTORS
AND SAME TO BE FOR CHARTERERS ACCOUNT.

53. Banking Details:



PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

54.    Deleted.

55.    Charterers confirm that they will have a full liability cover for the entire duration of
       the Charter.

56.    Deleted.



57.    Bimco Standard Law and Arbitration Clause 1985–English Law.
       London Arbitration
       This Contract shall be governed by and construed in accordance with English Law
       and any dispute arising out of or in connection with this Contract shall be referred
       arbitration, in London, in accordance with the Arbitration Act 1996 or any statutory
       modification or re-enactment thereof save to the extent necessary to give effect to the
       provisions of this Clause. The arbitration shall be conducted in accordance with the
       London Maritime Arbitrators Association (LMAA) terms current at the time when
       the arbitration proceedings are commenced.

       The reference shall be to three arbitrators. A party wishing to refer a dispute to
       arbitration shall appoint its arbitrator and send notice of such appointment in
       writing to the other party requiring the other party to appoint its own arbitrator
       within 14 calendar days of that notice and stating that it will appoint its arbitrator as
       sole arbitrator unless the other party appoints its own arbitrator and gives notice that
       it has done so within the 14 days specified. If the other party does not appoint its
       own arbitrator and give notice that it has done so within the 14 days specified, the
       party referring a dispute to arbitration may, without the requirement of any further
       prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise
       the other party accordingly. The award of a sole arbitrator shall be binding on both
       parties as if he has been appointed by agreement. Nothing herein shall prevent the
       parties agreeing in writing to vary these provisions to provide for the appointment of
       a sole arbitrator.

       In cases where neither the claim nor any counter-claim exceeds the sum of U.S.
       $100,000 (or such other sum as the parties may agree) the arbitration shall be
       conducted in accordance with the LMAA Small Claims Procedure current at the
       time.

58.    Deleted.

59.    Deleted.

60.    Bunker Survey Clause:
       Charterers have the option to call for a joint bunker survey upon delivery or after
       arrival at first loadport after delivery and/or upon redelivery or at last port before
       redelivery, in order to establish bunker figures upon delivery, respectively redelivery
       and such figures shall be final and binding for both parties.

       The Charterers will be represented by their supercargo(es) or appointed surveyor(s)
       and the Owners by the Master and/or Chief Engineer. Time for joint bunker survey
       upon delivery or after arrival at first loadport after delivery to be for Charterers'
       account and time for joint bunker survey upon redelivery or at last port before
       redelivery to be for Owners' account. Costs for surveys to be split 50/50 between
       Owners and Charterers.

                                    – 12 –

Fax sent by  : 12828531178            Atlas Shipping Ltd.            32/19/97   15:56   Pg: 5/15
11/87/2006 SUE 16:15  FAX  BETROP

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

61.    On/Off-Hire Condition Survey Clause:
Charterers have the option to call for an on/off-hire condition survey and/or an
on/off-hire condition survey upon delivery or after arrival at first loadport after
delivery and upon redelivery or at last port(s) before redelivery but same will only
be performed on Charterers' request or in the event of any stevedore or other
damage to the vessel during this Charter time and costs for such surveys to be split
50/50 between Owners and Charterers.

62.    Hatch Test:
Charterers to have the option to hose test or ultra sonic test the vessel's hatchcovers
at the loading port(s) at their time/expense and should same not be watertight
Owners have the right to arrange necessary measurements in order to make
hatchcovers fully watertight. Owners shall be given by Charterers three working
days after which if the hatchcovers are not watertight, Charterers have the right to
cancel this Charter Party and redeliver the same, provided no cargoes on board.

63.    Steel Clause:
In the event that steel cargo is loaded under the Charter Party, the Charterers have
the option to appoint a surveyor through their P. and I. Club to carry out a pre-
loading condition survey on the cargo. If this option is exercised and provided
Charterers P. and I. Club Surveyors are acceptable to Owners P. and I. Club then the
cost of such survey is to be shared equally between Owners and Charterers, and
Charterers to provide Owners a copy of the relevant survey report

Charterers to have the option to load cargo on vessel's deck/hatchcovers which not
to exceed respective strengths and always to subject to vessel's
stability/seaworthiness and always at Charterers risk/expense. Bill(s) of Lading for
deck cargoes to be clansed "Shipped on deck at Charterers / Shippers risk and
expense. Owners/vessel not responsible for any loss and/or damage howsoever
caused".

Charterers to supply, and crew to apply, ramnek tape on all hatches provided
shore/local regulations permit.

Charterers' option to install de-humidifying units in holds at their cost and time.

64.    Discharge of Cargo without Original Bill(s) of Lading:
Owners to comply with laws/customs of countries calling for discharge of cargo into
customs custody but only delivery by customs to consignees against consignees
handling customs the original Bill of Lading.  Charterers to furnish Owners with
Letter of Indemnity in Owners' P and I Club wordings for discharge of cargo into
customs custody without production of original Bills of Lading.

If no original Bills of Lading are available at any discharge ports, the Owners will
upon specific request from Charterers on each occasion permit delivery. In such
cases, Letter of Indemnity in Owners' P. and I. Club wordings to be issued and
signed by Charterers only. Charterers undertake that original Bills of Lading are
forwarded to Owners as soon as possible.

- 13 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

55.    I.S.M. Code:
From the date of coming into force of the International Safety Management (ISM)
Code in relation to the vessel and thereafter during the currency of this Charter
Party, the Owners shall procure that both the vessel and "the Company" (as defined
by the ISM Code) shall comply with the requirements of the ISM Code. Upon
request the Owners shall provide a copy of the relevant Document of Compliance
(DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay
caused by the failure on the part of the Owners or "the Company" to comply with
the ISM Code shall be for the Owners' account.

66.    Hold Condition:
On arrival at first loading port after delivery vessel's holds to be clean, swept
washed down by fresh water and dried up so as to receive/carry Charterers'
intended cargoes in all respects free of salt, rust scale and previous cargo residues to
the satisfaction holds not be approved by the surveyor's then vessel to be
placed off-hire from the time of such rejection until vessel's holds pass the
same inspection again and any directly related extra expenses for cleaning
holds to be for Owners' account.

67.    Owners confirm vessel is free of Asian Gypsy Moth.

68.    Deleted.

69.    Vessel is in all respects suitable for grab loading/discharging.

70.    Deleted.

71.    Should the vessel stay in a port or trade in tropical waters for any period exceeding
45 consecutive days Owners are not to be held responsible for any deficiency in
speed/consumption due to bottom fouling by marine growth, barnacles etc. and
Charterers to ensure vessel's bottom is cleaned with approved equipments at
Charterers' time and expense. In case Charterers have cleaned vessel's bottom, the
Charter Party S/C to be applicable again from the time the cleaning was completed.
However, actual cause/extent of such bottom fouling to be ascertained by joint
underwater survey by mutually agreed independant Marine Surveyor.

72.    If required by U.S. authority then following 'liner trade' clause to apply:

If loading cargo destined for the U.S. or passing through U.S. ports in transit, the
Charterers shall submit a cargo declaration directly to the U.S. customs. In all
circumstances, the cargo declaration must be submitted to the U.S. customs latest 24
hours in advance of loading. The Charterers assume liability for and shall
indemnify, defend and hold harmless the owners against any loss and/or damage
whatsoever (including consequential loss and/or damage) and any expenses, fines,
penalties and all other claims of whatsoever nature, including but not limited to legal
costs, arising from the Charterers' failure to comply with above. If the vessel is
detained, attached, seized or arrested as a result of the Charterers' failure to comply
with above, the Charterers shall provide a bond or other security to ensure the
prompt release of the vessel.

- 14 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

73.    The vessel shall during the duration of this Charter Party not be sold, break
       up and change flag, class, P and I, name, without Charterers' prior approval,
       which not to be withheld unreasonably.

74.    BIMCO ISPS CLAUSE FOR TIMECHARTER PARTIES 2005

(a) (i)  The Owners shall comply with the requirements of the International
        Code for the Security of Ships and of Port Facilities and the relevant
        amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and
        "the Company" (as defined by the ISPS Code). If trading to or from the United
        States or passing through United States waters, the Owners shall also comply with
        the requirements of the US Maritime Transportation Security Act 2002 (MTSA)
        relating to the Vessel and the "Owner" (as defined by the MTSA).

       (ii)  Upon request the Owners shall provide the Charterers with a copy of
       the relevant International Ship Security Certificate (or the Interim International Ship
       Security Certificate) and the full style contact details of the Company Security
       Officer (CSO).

       (iii )  Loss, damages, expense or delay (excluding consequential loss,
       damages, expense or delay) caused by failure on the part of the Owners or
       "the Company"/Owners" to comply with the requirements of the ISPS
       Code/MTSA or this Clause shall be for the Owners' account, except as
       otherwise provided in this Charter Party.

(b)    (i) The Charterers shall provide the Owners and the Master with the full
       style contact details and, upon request, any other information the Owners
       require to comply with the ISPS Code/MTSA.

       (ii) Loss, damages or expense (excluding consequential loss, damages or
       expense) caused by failure on the part of the Charterers to comply with this
       Clause shall be for the Charterers' account, except as otherwise provide in
       this Charter Party, and any delay caused by such failure shall count as
       laytime or time on demurrage.

(c)    Provided that the delay is not caused by the Owners' failure to comply
       with their obligations under the ISPS Code/MTSA, the following shall
       apply:

       (i) Notwithstanding anything to the contrary provided in this Charter
       Party, the Vessel shall be entitled to tender Notice of Readiness even if not
       cleared due to applicable security regulations or measures imposed by a
       port facility or any relevant authority under the ISPS Code/MTSA.

       (ii) Any delay resulting from measures imposed by a port facility or by
       any relevant authority under the ISPS Code/MTSA shall count as laytime or
       time on demurrage, unless such measures result solely from the negligence
       of the Owners, Master or crew or the previous trading of the Vessel, the
       nationality of the crew or the identity of the Owners' managers.

- 15 -

FCI. Ref. 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

## 74.  BIMCO ISPS CLAUSE FOR TIMECHARTER PARTIES 2005 (continued)

(d)     Notwithstanding anything to the contrary provided in this Charter Party, any costs
or expenses whatsoever solely arising out of or related to security regulations or
measures required by the port facility or any relevant authority in accordance with
the ISPS Code/MTSA including, but not limited to, security guards, launch
services, vessel escorts, security fees or taxes and inspections, shall be for the
Charterers' account, unless such costs or expenses result solely from the negligence
of the Owners, Master or crew or the previous trading of the Vessel, the nationality
of the crew or the identity of the Owners' managers. All measures required by the
Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e)     If either party makes any payment which is for the other party's account  according
to this Clause, the other party shall indemnify the paying party.

## 75.  Double Banking Clause
Charterers shall have the option of ordering the vessel to lie alongside other
vessels/coasters/lighters at any safe anchorage without swell and/or safe berth/safe
dock/safe wharf for the purpose of loading/discharging of the cargo and/or for bunkering,
but always subject to Master's absolute discretion whether such operations are safe and
feasible. The Master may if he considers it at anytime unsafe to commence or continue such
operations order the other vessels/coasters/lighters away from his vessel to a safe distance
and such vessels/coasters/lighters must obey such orders. Master may also remove his
vessel to a safe distance. Charterers shall supply adequate and proper fenders, lines and
securing equipment acceptable to the Master and shall also be liable for any damage caused
to the vessel by the other vessels/coasters/lighters during approach, securing, lying
alongside, unsecuring and departure of the other vessels/coasters/lighters provided the
Master has notified

Charterers or their agents of such damage in writing/telex/cable. Final and sole authority
for placing of fenders shall always remain with the Master of the vessel. The Master shall at
all times give full cooperation to Charterers and/or their agents to expedite the
loading/discharging.

All above operations to be at Charterers' entire risk, time and costs.

Extra insurance if required for any/all of the above operations to be for Charterers account
and Charterers to pay Owners same against Owners providing their underwriters/brokers
invoice.

Delivery overside into other vessels/coasters/lighters in the case of discharging to
constitute right and true delivery of cargo under the relative bills of lading.

## 76.  Ice Clause
The vessel not to be ordered to nor bound to enter or remain in any icebound port,
place/area or any port, place/area where lights, lightships, marks and buoys are or are
likely to be withdrawn by reason of ice or where there is risk that in the ordinary course of
things the vessel will not be able on account of ice to safely reach, enter and remain in
the port, area/place or to get out after having completed loading or discharging.

- 16 -

Fax sent by  : 12038531178         Atlas Shipping Ltd.         82/19/87  15:56   Pg: 9/15
11/07/2005 TUE 16:18  FAX  pe=acc ............   ....  . .................. . ....

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

76. Ice Clause (continued)
The vessel not to be obliged to force ice but may follow ice-breakers in convoy provided
vessel is not the first or the last vessel in the convoy. Ice-breakers, ice advisors to be for
Charterers' account. If on account of ice the Master considers it dangerous to remain at the
loading or discharging port, area/place for fear of the vessel being frozen in and/or
damaged, he has liberty to sail to a convenient open safe place and await Charterers fresh
instructions. It is understood that the vessel remains on hire during such period."

77. Termination on Bankruptcy of Either Chartering Party
The following provision shall apply to this Charter party only if there is not in force between
the parties an effective netting agreement in respect of all outstanding Transactions (as
defined below) between them. The provision shall not apply to, or be incorporated in any
Bill of Lading.

(a) The parties to this Charter Party agree that if at any time a Bankruptcy Event (as defined
below) occurs in relation to either of them (the "Defaulting Party"), the other party (the
"non-Defaulting Party") may be not more than 20 days' notice to the Defaulting Party
designate a close-out date in respect of all Transactions then outstanding between them on
which the process set out in paragraph (b) shall occur (subject o paragraph(c) below).

(b) As of the close-out date (i) all performance obligations of the parties under outstanding
Transactions shall terminate (ii) the Non-Defaulting Party shall promptly calculate its Loss
(as described below) in respect of each Transaction (iii) the Losses so calculated shall be
aggregated and netted to the greatest extent possible (and, in order to effect this, the Non-
Defaulting Party may convert any such Losses at commercially reasonable rates into such
currency as may be required) and (iv) the next resulting amount, if positive, shall be paid by
the Defaulting party to the non-Defaulting party within 3 days of the close-out date. If the
net resulting amount is negative, no amount shall be due from or payable by either party to
the other. Interest on the net resulting amount shall accrue at the rate of overnight LIBOR
plus 3% if such amount is not paid when due.

(c) A close-out date (as described above) shall occur automatically as of the time
immediately before the start of a Bankruptcy Event specified in paragraph (1), (3), (4), (5), (6)
or, to the extent analogous, (8) of the definition

(d) The parties to this Charter Party acknowledge and agree that the Transactions between
them form a single agreement and have entered into the Transaction or. this basis.

78. Set-Off
Following a default by either party hereunder (the "Defaulting Party") the other party (the
"non-Defaulting Party") shall be entitled, at its option, to set-off any amounts believed in
good faith and on reasonable grounds by the Non-Defaulting Party to be payable (whether
under this Contract or otherwise), against any amounts believed in good faith and on
reasonable grounds by the Non-Defaulting Party to be payable (whether at such time or in
the future or upon the occurrence of a contingency) by the Defaulting party to the Non-
Defaulting party (whether under this contract or otherwise, against any amounts believed in
good faith and on reasonable grounds by the Non-Defaulting Party (whether under this
Contract or otherwise), irrespective of the currency, place of payment or booking office of
either party's obligations and the parties respective obligations shall be discharged promptly
and in all respects to the extent they are so set-off to be effected under this provision. For

- 17 -

Fax sent by  : 12038531178          Atlas Shipping Ltd.          02/19/07   15:55   Pg: 18/15
11/07/2006 TUE 16:19  FAX  983300

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

## 78. Set-Off (continued)

this purpose, any such amount payable by one party to the other (or the relevant portion of
such amount) may be converted by the Non-Defaulting Party, acting in good faith and in a
commercially reasonable manner, into such currency as may reasonable be required in a
commercially reasonable manner. If an obligation is unascertained, the Non-Defaulting
Party may in good faith estimate that obligation and set-off in respect of the estimate, subject
to the relevant party accounting to the other when the obligation is ascertained. The right of
the Non-Defaulting Party under this provision shall apply without prejudice to Clause 77 or
any other right of set-off which it may have whether by agreement, operation of law or
otherwise. Nothing in this provision shall be effective to create a charge or other security
interest.

## 79. U.S. Customs Advance Notification / AMS Clause for Time Charter Parties

(A)   If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports
      in transit, the Charterers shall comply with the current U.S. customs Regulations (19
      CFR 4.7) or any subsequent amendments thereto and shall undertake the role of
      carrier for the purpose of such regulations and shall, in their own name, time and
      expense.
      i)    Have in place a SCAC (Standard Carrier Alpha code);
      ii)   Have in place an ICB (International Carrier Bond);
      iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
      iv)   Submit a cargo declaration by AMS (Automated Manifest System) to the
            U.S.Customs and provide the Owners at the same time with a copy thereof.

(B)   The Charterers assume liability for and shall indemnify, defend and hold harmless
      the Owners against any loss and/or damage whatsoever (including consequential
      loss and/or damage) and/or any expenses, fines, penalties and all other claims of
      whatsoever nature, including but not limited to legal costs, arising from the
      Charterers' failure to comply with any of the provisions of sub-clause (A).
      Should such failure result in any delay then, notwithstanding any provision
      in this Charter party to the contrary, the Vessel shall remain on hire.

(C)   If the Charterers' ICB is used to meet any penalties, duties, taxes or other
      charges which are solely the responsibility of the Owners, the Owners shall
      promptly reimburse the Charterers for those amounts.

(D)   The assumption of the role as carrier by the Charterers pursuant to this
      Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7)
      shall be without prejudice to the identity of carrier under any Bill of Lading,
      other contract, law or regulation

## 80. BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a)  Without prejudice to anything else contained in this Charter Party, the Charterers shall
     supply fuels of such specifications and grades to permit the Vessel, at all times, to
     comply with the maximum sulphur content requirements of any emission control zone
     when the Vessel is ordered to trade within that zone.

- 18 -

PCL Ref: 5797
Additional Clauses to M/V "BOCNTRIKA NARER" Charter Party dated Stamford, Connecticut October 13, 2006

80. BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005 (con't)
The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-Clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zones; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

81. Charterers to comply with any/all United States Department of Agriculture's (USDA) Animal and Plant Health Inspection Service (APHIS) Import Regulation for Wood Packaging Material (WPM). Any/all consequences, loss, damages, expense or delay caused by the failure on the part of the Charterers to comply with above regulation and/or requirements shall be for Charterers account.

82. BIMCO Stowaways Clause for Time Charters
(a)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.
(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.
(iii) Should the vessel be arrested as a result of the Charterers' breach of Charter according to sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

- 19 -

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 15, 2005

52. BIMCO Stowaways Clause for Time Charters (continued)
(b)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have
gained access to the vessel by means other than secreting away in the goods and/or containers
shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred,
including fines, shall be for the owners' account and the vessel shall be off hire.
(ii) Should the vessel be arrested as a result of stowaways having gained access to the vessel
by means other than secreting away in the goods and/or containers shipped by the
Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable
time, the vessel is released and at their expense put up bail to secure release of the vessel.

Fax sent by  : 12038531178        Atlas Shipping Ltd.        82/19/87   15:56   Pg: 13/15
11/377/2806  TUE  :  57 21  FAX'  pexaco                                      KR/16/M56

FCL Ref 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter
Party falls to be determined in accordance with the laws of the United States of America, the
following clause shall apply :-

## BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other
ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier
in the navigation or in the management of the ship, the owners of the goods carried
hereunder will indemnify the carrier against all loss or liability to the other or non-carrying
ship or her owners in so far as such loss or liability represents loss of or damage to or any
claim whatsoever of the owners of the said goods, paid or payable by the other or non-
carrying ship or her owners to the owners of the said goods and set off, recouped or
recovered by the other or non-carrying ship or her owners as part of their claim against the
carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of
any ship or ships or objects other than, or in addition to, the colliding ships or objects are at
fault in respect to a collision or contact."

and the charterers shall procure that all Bills of Lading issued under this Charter Party shall
contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE
General Average shall be payable according to the York/Antwerp Rules, 1974, but where
the adjustment is made in accordance with the law and practice of the United States of
America, the following clause shall apply :-

## NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of
the voyage, resulting from any cause whatsoever, whether due to negligence or not for
which, or for the consequence of which, the carrier is not responsible, by statute, contract or
otherwise, the goods, shippers, consignees or owners of the goods, shall contribute with the
carrier in general average to the payment of any sacrifices, losses or expenses of a general
average nature that may be made or incurred and shall pay salvage and special charges
incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if
the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents
may deem sufficient to cover the estimated contribution of the goods and any salvage and
special charges thereon shall, if required be made by the goods, shippers, consignees or
owners of the goods to the carrier before delivery."

- 21 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford, Connecticut October 13, 2006

WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CODE NAME: CONWARTIME 2004)

(a)    For the purpose of this Clause, the words:

(i)    'Owners' shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)    'War Risks' shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only become dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessel of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right of search and/or confiscation.

(d) (i)    The Owners may effect war risks insurance in respect of Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.

(ii)    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

- 22 -

Fax sent by : 12030531178
11/07/2008 TUE 16:22 FAX peraso          Atlas Shipping Ltd.          02/13/07   15:56   Pg: 15/19

PCL Ref: 5797
Additional Clauses to M/V "SOONTREKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

(e)      If the Owners become liable under the terms of employment to pay to the crew any
bonus or additional wages in respect of sailing into an area which is dangerous in the
manner defined by the said terms, then such bonus or additional wages shall be reimbursed
to the Owners by the Charterers at the same time as the next payment of hire is due.

(f)      The Vessel shall have liberty:-

to comply with all orders, directions, recommendations or advice as to departure, arrival,
routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery,
or in any other way whatsoever, which are given by the Government of the Nation under
whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or
any other Government, body or group whatsoever acting with the power to compel
compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risk underwriters
who have the authority to give the same under the terms of the war risk insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United
Nations, any directives of the European Community, the effective orders of any other
Supranational body which has the right to issue and give the same, and with national laws
aimed at enforcing the same to which the Owners are subject, and to obey the orders and
directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel
liable to confiscation as a contraband carrier;

(v)  to call at any other port to change the crew or any part thereof or other persons on board
the Vessel when there is reason to believe that they may be subject to internment,
imprisonment or other sanctions.

(g)  If in accordance with their rights under the foregoing provisions of this Clause, the
Owners shall refuse to proceed to the loading or discharging ports, or anyone or more of
them, they shall immediately inform the Charterers. No cargo shall be discharged at any
alternative port without first giving the Charterers notice of the Owners' intention to do so
and requesting them to nominate a safe port for such discharge. Failing such nomination by
the Charterer within 48 hours of the receipt of such notice and request, the Owners may
discharge the cargo at any safe port of their own choice.

(h)  If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause
anything is done or not done, such shall not be deemed a deviation, but shall be considered
as due fulfilment of this Charter Party.

## GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the
carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in
the International Convention, dated Brussels, 25th August, 1924 and which is compulsorily
applicable to the contract of carriage herein contained. Such legislation shall be deemed to
be incorporated herein, but nothing herein contained shall be deemed a surrender by the
Carrier of any of its rights or immunities or an increase of any of its responsibilities or
liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to
any legislation by this clause incorporated, such term shall be void to that extent
but no further. Nothing in this Bill of Lading shall operate to limit or deprive the
Carrier of any statutory protection or exemption from, or limitation of, liability.

- 25 -

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NORWEGIAN BULK TRANSPORT A/S,        :

                   Plaintiff,       :     08 Civ.

      - against -           :     ECF CASE

PIONEER NAVIGATION LTD.,        :

                Defendant.   :
-----------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                )   ss: Town of Southport
County of Fairfield   )

Charles E. Murphy, being duly sworn, deposes and says:

1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANT IS NOT PRESENT IN THE DISTRICT

2.    I have attempted to locate the Defendant, PIONEER NAVIGATION LTD., within this District. As part of my investigation to locate the Defendant within this District, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendant. I also performed a Google search on the Internet. Finally, I checked the New York State Department of Corporations' online database which showed no listings or registration for the Defendant.

3.   I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.   Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

5.   Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Maritime Attachment and Garnishment and/or the Verified Complaint, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendant.

6.   Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

7.   To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple

-3-

delivery of the Process of Maritime Attachment and Garnishment to the various garnishes to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

8.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

9.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, to authorize service of process via facsimile or e-mail following initial *in personam* service.

Charles E. Murphy

Sworn and subscribed to before me
This 20th day of June 2008.

Notary Public/Commissioner of Superior Court

−3−