```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
NORWEGIAN BULK TRANSPORT A/S,      :
                                   :
                    Plaintiff,     :      08 Civ. 5591 (LAP)
                                   :
                                   :      ECF
          -against-                :
                                   :      DECLARATION OF
                                   :      JAMES P. RAU
PIONEER NAVIGATION LTD.,           :
                                   :
                    Defendant.     :
---------------------------------x
```

JAMES P. RAU, affirms under penalties of perjury under the laws of the United States, 28 U.S.C. §1746:

1.   I am a member of the Bar of this Court and represent the Defendant herein.  I am familiar with the facts of this case and make this Declaration in support Defendant's motion seeking to vacate, or alternatively reduce, Plaintiff's maritime attachment.

2.   I have spoken with counsel for Plaintiff on July 8 and July 14, 2008 in a good faith effort to obtain Plaintiff's voluntary agreement to reduce the amount of the attachment as the estimated costs and fees claimed were excessive under the Small Claims Procedure applicable in the parties London arbitration.  These efforts were to no avail requiring the instant motion.

3.   Attached hereto as Exhibit 1 is a copy of the Plaintiff's Verified Complaint filed in support of its

application for issuance of a maritime attachment pursuant to Supplemental Admiralty Rule B.

4.    Attached hereto as Exhibit 2 is a copy of the Court's Ex-Parte Order authorizing restraint of Defendant's funds pursuant to Supplemental Admiralty Rule B.

5.    Attached hereto as Exhibit 3 is a copy of the London Maritime Arbitrators Association Small Claims Procedure provisions.

6.    Attached hereto as Exhibit 4 is a copy of the London Maritime Arbitrators Association fees and costs as of July 1, 2008.

7.    Attached hereto as Exhibit 5 is a copy of the exchange rates as of today for the British pound to US Dollar.

The foregoing is true and correct to the best of my knowledge under the penalties of perjury under the laws of the United States.

Executed at New York, New York, this 23rd day of July, 2008.

JAMES P. RAU

# EXHIBIT

# 1

JUDGE PRESKA



08 CV 5591

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
NORWEGIAN BULK TRANSPORT A/S,          :

                 Plaintiff,          :          08 Civ.

    - against -          :

PIONEER NAVIGATION LTD.,          :

                 Defendant.          :
------------------------------------------------------X

ECF CASE

RECEIVE

JUN 20 2008

U.S.D.C. S.D. N.Y.
CASHIERS

### VERIFIED COMPLAINT

    Plaintiff, NORWEGIAN BULK TRANSPORT A/S (hereinafter referred to as

"Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendant, PIONEER NAVIGATION, (hereinafter referred to as

"Defendant") alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

    2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under foreign law with a principal place of

business in Bergen, Norway.

    3.    Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity organized and existing under foreign law with a principal place of business

in Nassau, Bahamas.

4.      By a charter party and fixture note dated February 20, 2007 on the New York Produce Exchange charter party form, Plaintiff chartered from Defendant the M/V BOONTRIKA NAREE for a duration of about 30/35 days for the carriage of a harmless cargo of manganese ore in bulk. *See Recap and pro forma Charter Party attached as Exhibit 1.*

5.      As a warranty of the charter party Defendant warranted to Plaintiff *inter alia* that the Vessel would perform at a specified speed. Materially, the recap reads "speed/cons abt 13.25 kn on about 22 mt ifo 380cst plus about 1.5 mt mdo all dts abt". That is, Defendant warranted that the Vessel would perform at speeds of 13.25 knots while consuming about 22 metric tons of intermediate fuel oil plus 1.5 metric tons of marine diesel oil. The foregoing description was not qualified in any manner in the recap.

6.      Once delivered to Plaintiff, the Vessel did not perform as guaranteed by Defendant and, in fact, grossly underperformed. In this regard, Defendant breached the charter party by falsely warranting to Plaintiff the Vessel's capabilities.

7.      Due to the Vessel's underperformance, Plaintiff made a deduction from hire after redelivering the Vessel to Defendant. Currently there is a dispute between Plaintiff and Defendant concerning the quantum of hire that is due. Specifically, Defendant has presented a claim against Plaintiff and has alleged that Plaintiff's deduction from hire was illegal: Defendant contends that the charter party did not contain a performance guarantee notwithstanding the warranty language in the Recap, reprinted in Paragraph 5 above. Conversely, Plaintiff has presented a claim against Defendant in the amount of $2,579.38 for the hire balance due to Plaintiff.

8.      Pursuant to the charter party, all disputes must to be submitted to arbitration in London with English Law to apply.

2

9.    As a result of the foregoing, and in particular Defendant's refusal to abandon its hire claim against Plaintiff, London arbitration has been commenced by Plaintiff as against Defendant. In the arbitration Plaintiff is seeking a declaration of rights from the arbitrators. More specifically, Plaintiff is seeking a final arbitration award that establishes that Plaintiff's hire deduction was valid under the governing charter party and under the governing English law. Additionally, Plaintiff is also seeking an award in its favor in respect of hire in the amount of $2,379.38. Plaintiff has provided Defendant with written notice of the commencement of arbitration. Defendant has not yet appeared in the arbitration.

10.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Due to Defendant's unreasonable actions in continuing to pursue a baseless hire claim against Plaintiff, it became necessary for Plaintiff to seek declaratory relief from the arbitrators. If Plaintiff prevails in the arbitration, as Plaintiff expects that it will, the arbitrators will award Plaintiff its costs and fees incurred in having to bring the arbitration. As best as can be estimated, Plaintiff estimates that it will be awarded its fees and costs in the amount of $75,000.00.

11.    When its claim for legal costs in bringing the arbitration is combined with its hire claim, Plaintiff expects that it will obtain an arbitration award against Defendant in the total amount of $77,379.38.

12.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *See Murphy Affidavit attached as Exhibit 2.* However, upon information and belief, Defendant has, or will have during the pendency of this action, assets

within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

13.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, inter alia, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$77,379.38** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

4

C.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court.

D.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.     That this Court award Plaintiff its attorney's fees and costs of this action; and

F.     That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

June 20, 2008
New York, NY

The Plaintiff,
NORWEGIAN BULK TRANSPORT A/S,

By: _Charles E. Murphy_

Charles E. Murphy (CM 2125)
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
cem@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    New York City
County of New York  )

1.     My name is Charles E. Murphy.

2.     I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.     The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.     The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     June 20, 2008
           New York, NY

Charles E. Murphy

# EXHIBIT 1

Andrew Ridings

Subject:                FW: Bontrika Naree recap

-----Opprinnelig melding-----
Fra: mail@granpa.com [mailto:mail@granpa.com]
Sendt: 20. februar 2007 17:23
Til: mk52
Emne: Doc-No. 867317

Doc-No. 867317  20/FEB/2007  16:22 (UTC) JENS

FROM NORMAR INTL

ATT:JAMES SHAW
CC: GG

FIXTURECONFIRMATION:

CP DATE 20.2.2007

BOONTRIKA NAREE / NBT
==

PLEASED TO ADVISE MAINTERMS AGREEMENT AS FOLL:-

M/V Boontrika Naree
Sdk log/bulker ob aft
Thai flg blt 1990 Jpn
27,881mt dwat on 9.414m
Tpc loaded 39.55mt/fwa 214mm
5 holds/5 hatches
1,350,469cbft gr in mh
4x30mt cranes outreach abt 8.0m
Loa/beam 176.50m/28.00m
Grt/nrt 17,066/9,904
Speed/cons abt 13.25kn on abt 22mt ifo 380csl plus abt 1.5mt mdo all dets about

OWS CONFIRM VSL HAS NO GANTRY CRANES
OWS CFIRM VSL FITTED WITH AUSTRALIAN HOLD LADDERS OWS CFIRM VSL IS NOT FITTED WITH ANY
SUPERSTRUCTURES IN CRGO HOLDS THAT MAY HINDER LOADING/DISCHARGE DISTANCE FROM
HATCHCOAMINGS TO SHIPS RAIL - (AS PER ATTACHMENT FROM MASTER) VESSEL HAS COLLAPSIBLE
STEEL STANCHIONS #1 6.50M
#2-5 9.0M

FOR:

- ACCOUNT NORWEGIAN BULK TRANSPORT A/S

- DELY DLOSP DOUALA ATDNSHINC

- LAYCAN 22/28 FEB 07

- ONE TCT VIA SP(S) SB(S) SA(S) AA AWIWL VIA GABON TO NORWAY ONLY NOT
  NORTH OF BERGEN WITH HARMLESS CARGO OF MANGANESE ORE IN BULK ONLY
  DURATION ABT 30/35 DAYS WOG

- NAABSA NORWAY (AS PER OWS B-T-B C/P IE WHERE CUSTOMARY)

- HIRE USD 21,500 DAILY INCLOT

1

- REDELY DLOSP 1SP NORWAY NOT NORTH OF BERGEN (INT SAUDA)

- CAVE USD 1,300/MONTH PRO RATA

- ILOHC USD 4,500 LUMPSUM

- BUNKERS ON DEL AS ONBOARD EST ABT 425/475MT IFO AND ABT 35/45MT MDO
  BUNKERS ON REDELIVERY SAME AS ONBOARD ON DELIVERY
  PRICES BENDS USD 285MT IFO AND USD 585PMT MDO

- 2,5 PCT ADDCOM PLUS 1.25 PCT NORMAR PLUS 1 25 PCT HOWE ROB LONDON

- BIMCO FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES TO
  APPLY

- OWNERS B-T-B C/P AS RECEIVED IN ATTACHMENT FROM HOWE ROB
  WITH LOGICAL ALTERATIONS AS AGREED ABOVE


ALL SUBS LIFTED


THANKS FIXTURE
REGARDS
JENS GRAN


Normar Intl. Shipping Ltd.
Phone: +44 208 9448936
Fax:   +44 208 9442867
Email: mail@oranpa.com
       mail@normar.biz

Fax sent by : 12038531178          Atlas Shipping Ltd.          02/19/07   15:46   Pg: 2/14

11/977/2006 TUE 19:05  FAX  P88800

*PCI Ref "5962. M/V "BOONTRIKA NAREE" / PIONEER NAVIGATION CP 10/13/06*

PERACO CHARTERING (USA), LLC
CLEARWATER HOUSE
2187 ATLANTIC STREET
STAMFORD, CONNECTICUT 06902

# Time Charter

## ORIGINAL

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in *Stamford, Connecticut  13th ...... day of October 2006 ...... 19 ...*
2  Between ..............................................................................................
3  Owners of the good *Thai Flag* ...................... Steamship/Motorship *"BOONTRIKA NAREE"* ..................... of ......................
4  of 17966 ............... tons gross register, and 9964 ............. tons net register, having engines of ......................... indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state *and appearance*, and classed *NK, NS (Bulkcarrier) MNS*
6  at ..............., at about *1,359,499/1,317,709 ...... cubic feet grain/bale capacity available for cargo*, and about 27581 metric ....... tons of 2240 lbs.,
7  deadweight capacity (cargo and bunkers, including fresh water and stores *not exceeding one and one-half percent of ships deadweight capacity*,
8  allowing a minimum of fifty tons) on a draft of 9.766 .... inches ...... meters*) .... inches on ..... Summer freeboard, inclusive of permanent bunkers,
9  which on a ..... capacity of about ...... tons of fuel, and capable of steaming throughout the entire period of this Charter Party, fully laden, under good
10 conditions about 13.25 ...... knots on a consumption of about 32 metric ..... tons of Intermediate Fuel Oil (380 CST) plus about 1.5 metric tons
   *Marine Diesel Oil best Methrom bunkers-good-fuel oil - not grade Diesel-Oil (Also see Clause 52);*
11 now ..............................................................................................
12 ...... and *PIONEER NAVIGATION LTD.* ........................... Charterer of the City of *Nassau, Bahamas* ..................
13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about ..............................................................................................  *Trading always via safe port(s), safe*
15 *berth(s), safe anchorage(s), safe places, always within IWL, always accessible, always afloat except NAABSA in customary*
   *places (Columbia-Brazil-Norway-Argentina) to be allowed provided the place is safe with soft mud which will not damage*
   *vessel's bottom/hull. Charterers' option to breach IWL against paying Owners the additional premium for such breach of IWL*
   *at per Owners' underwriters/brokers' fixed invoice net of any rebates/commission. The additional premium not to exceed*
   *Lloyds of London scale. Vessel not to force ice or follow ice-breakers, within below mentioned trading limits.*
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfilment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Charterers' rights
   hereunder.
18 Vessel to be placed at the disposal of the Charterers, at ...... on dropping outward sea pilot within current CP's redelivery range. Owners to
19 give Charterers at least .../3/2/1 days notice of delivery date and port. ........................
20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause 6, 61, 6) in
21 the Charterers may direct. If such dock or place or such wharf be not available on arrival provided for in clause 18, 6. Vessel on her delivery or latest on her
22 arrival at first loading port after delivery, vessel's holds to be
   ready to receive cargo with clean-swept, washed down by fresh water and dried up holds; so as in receive/carry Charterers' intended
   cargoes in all respects free of salt, rust scale and previous cargo residues to the satisfaction of independent surveyors. In case
   the vessel's holds not approved by the surveyors then vessel to be placed off-hire from the time of such rejection until vessel's
23 holds pass the same inspection again and any directly related extra expenses for cleaning holds to be for Owners' account; and
   tight, staunch, strong and in every way fitted for the service, having water ballast, winches and
24 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful/harmless cargoes
   merchan-
25 dise, including petroleum or its products in proper containers, excluding *See Clause 57.*
26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at ship's risk,
27 all necessary fittings and other requirements to be the account of Charterers) in such lawful trades, between safe port, at/or ports in British North
28 America, and/or United States of America and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Mexico, and/or
29 Mediterranean Sea, and/or
30 and/or India, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31 October 31st and May 31st, Hudson Bay and of inward ports, also excluding when out of season, White Sea, Black Sea and the Baltic,
31 *Worldwide trading excluding Israel and warlike zones - See also Clause 36.*
33 ..............................................................................................
34 ..............................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36 1.    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees *including agency fees of the Crew*,
37 shall pay for all insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, *cargo spaces*, machinery and equipment for and during the service.
39 2.    That whilst *on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *Customary and*
   *Compulsory watchmen*, Pilotage, Agencies, Commissions, *Canal Dues*,
40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

Fax sent by : 12039531178          Atlas Shipping Ltd.          02/19/87   15:46   Pg: 3/14

*PCI Ref: 5797 M/V "BOONTIRA NAREE" / PIONEER NAVIGATION CP 10/13/06*

41  t past for camps for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while
43  vessel is employed under this
44  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
45  of six months or more except *for illness of the crew.*
46  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
47  Owners to allow them the use of any dunnage and shifting boards *and lashing equipment* already aboard vessel. Charterers to have the privilege of using
48  shifting boards
49  for dunnage, they making good any damage thereto.

50  3.  *That the Charterers at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all sounding or bunkers on*
        *board the vessel at the current prices in the respective ports the vessel to be delivered with not less than .... tons and not more than .... See Clause 38.*

51  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of .... *daily including overtime.*
52  ........................United States Currency per ton on vessel's total deadweight carrying capacity including bunkers and
53  stores ...... harbour Southport, per Calendar Month commencing on and from the day *and time* of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost *upon vessel being redelivered from* .................
56  ............................ on dropping last outward sea pilot one safe port in Owners' option any time day or
     night, Sundays and Holidays included within the the following ranges: *Singapore/Japan including*
     *Malaysia/Indonesia/Phillippines/South Korea/China; Aden/Colombo including Aden Gulf/Persian Gulf but for Persian Gulf*
     *redelivery to be passing Muscat outbound and for Red Sea redelivery to be passing Aden eastbound; Capetown/Retro/*
     *Dakar/Douala; ShawMediterranean including Adriatic/TN/ERo/Black Sea and Morocco; Boston/Buenos Aires including*
     *ECCA, NCAS, Cartobeans excluding Cuba; Vancouver/Callao* unless otherwise mutually agreed. Charterers are to give Owners not less than
     25/20/15/12/10/8/7/5/3/2/1 days

57  notice of vessels expected date to re-delivery with date, and *probable port/place.*

58  5.  Payment of said hire to be made in New York in Owners' bankers correspondents' bank in cash in United States Currency, *every 15 days*
     semi-monthly in advance, and for the last *15 days* half-payment
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time at least than 2 past, on the working day
63  following failure whereby notice of restitution has been give to Charterers or his Agents before 4 past, but if required by Charterers, they
64  to have the privilege of using vessel 4 past in service respectively.
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers however, shall in no way be responsible for the application
67  of such advances.

68  6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any safe wharf or *safe place in port, or safe anchorage(s)* that
     Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, *except at such places where it is customary for similar sized vessels to safely*
70  *lie aground.*

71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow, Charterers
74  paying Owners ................ per day per passenger for accommodation and meals. However, it is agreed that in case any loss or damage arises
75  through the carriage of passengers the owners are to be indemnified against such claims and expense.

76  8.  That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency, and Charterers are to load, stow, and trim, *discharge, lash, unlash, dunnage, secure, unsecure, tally, draft survey* the cargo at their
79  expense under the supervision of the Captain, who is to sign Bills of Lading for
80  cargo as presented, in conformity with Mate's and/or Tally Clerk's receipts.

81  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
     receiving particulars of the complaint, investigate the same and, if necessary, make a change in the appointments.

82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall, *subject to availability of lifeboat capacity/accommodation*
     *and signing Letter of Indemnity in Owners' P & I Club forms/wordings,* accompany the vessel and see that voyages are prosecuted
83  with the utmost dispatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of USD 19.00 $4.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc. Charterers paying .... *(One Thousand Two Hundred Dollars) lumpsum per month/pro rata*
     *including cables, victualling, entertainment and representation.* at the current rate per meal, for all such victualling.

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs *in English,* showing the course of the vessel and distances
89  run and the con-
90  sumption of fuel.

91  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.

92  13.  *That the Charterers shall have the option of cancelling this charter in its clause period of ....*
93  ........................ on giving notice thereof to the Owner or their Agents. ...................... if any options of the date named below by mutual consent agree.

94  14.  That if required by Charterers, time not to commence before .................. and should vessel

*PCI Ref: 5797 M/V "BOONTRIKA NAREE" / PIONEER NAVIGATION CP 10/13/06*

95  
96  

97      15. Text in the event of the loss of time from deficiency and/or default of men or deficiency of stores, fire, breakdown or damages to hull, machinery or equipment,

98  
99      preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost and if upon the voyage the speed be reduced by

100     defeat in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101     thereof, and all extra expenses shall be deducted from the hire.

102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103     returned to the Charterers at once. The act of God, enemies, fire, enemies of Princes, Atlas and People, and all dangers and accidents of the Seas,

104     Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106     purpose of saving life and property.

107     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to Arbitration as per Clause 57, then

108  
109  
110     the purpose of collecting any money this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.

111     18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

112     age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

113     deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

114     might have priority over the title and interest of the Owners in the vessel.

115     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116     Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15 inclusive, 17 to 22 inclusive and Rule F of

        York-Antwerp Rules 1994 *in London* 1924, and at such port or place in the United States or country as selected by the carrier, and as to matters not provided for by

117  
118  
119  
120  
121  
122  
123  
124  
125     United States money. *Fire not to contribute to General Average.*

126  
127  
128  
129  
130  
131  
132     *See New Jason Clause as attached.*

133  
134     20. Fuel used by the vessel while at hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

135     cost of replacing same, to be allowed by Owners.

136     21. That at the vessel duty to Owners risk is duly employed in agents' service during the currency of this Charter, Vessel is to be docked at a

137  
138     *Owners shall have the option to place the vessel in drydock during the currency this Charter at a convenient time/place to*

        *be mutually agreed always within the time frame of class requirement and/or demands of circumstances for bottom cleaning*

        *and painting and/or repairs as required by Class or dictated by circumstances. Payment of hire shall be suspended upon*

        *deviation from Charterers' services until vessel is again placed at Charterers' disposal at a point not less favorable to Charterers*

        *than when the hire was suspended. Owners to give not less than 90 days notice if intended drydock as well as intended country;*

        *Charterers to keep Owners advised of vessel's schedule/itinerary as best as possible.*

140     22. Owner shall maintain the gear of the ship as fitted, providing gear (for all cranes suitable at all times) capable of handling lifts up to *maximum*

        *in accordance with Description Clause,* fore, aft, also

141  
142     providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with derricks capable of handling heavier lifts, Owner are to provide necessary gear for

143     night work,    pad furnish all   of ship   winches also   when on   board, but any   additional rigging   etc. as on   board is to   at Charterers expense. The

144     Charterers to have the use of any gear on board the vessel.

145     23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging

146  
147  
148     port or later unless present crew from driving winches, shore crane/cranes winchmen to be *employed* and *paid* by Charterers, in the event of a clapped

149     crane/winch *or cranes winches,* or

150     *If Owners pay for shore engine or engines, then vessel to remain on-hire provided such shore engine(s) is(are) able to*

        *keep the same discharging rate as the vessel's crane(s) is(are) in good working condition.*

151     24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152     in the Act of Congress of the United States approved on the 13th day of February, 1893 and entitled "An Act relating to Navigation of Vessels

153     etc.", in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of

154     which are to be included in all bills of lading issued hereunder:

Fax sent by : 12838531170        Atlas Shipping Ltd.        02/19/07    15:46    Pg: 5/14

PC: Ref: 5797 M/V "BOONTRIKA MAREE" / PIONEER NAVIGATION CP 10/13/06

155
156                                                    U.S.A. Clause Paramount
157      ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
158      ~~16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of~~
159      ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
160      ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
161                                                   Both-to-Blame Collision Clause See New Both-to-Blame Collision Clause as attached
162      ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163      ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
164      ~~hereunder will indemnify the Carrier against all loss or liability to the other non-carrying ship or her owners in so far as such loss~~
165      ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other non-car-~~
166      ~~rying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~
167      ~~owners as part of their claim against the carrying ship or carrier.~~
168          15.  The vessel shall not be required to *force ice or to follow ice breaker or to* enter any ice-bound port, or any port where lights or light-ships
169      have been or are about to be with-
170      drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
171      port or to get out after having completed loading or discharging *See Clause 76.*
172          26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
173      navigation of the vessel, *acts of pilots,* insurance, crew, and all other matters, same as when trading for their own account.
174          27.  A commission of *1.25% 1-10* per cent is payable by the Vessel and Owners to
175      *PERACO CHARTERING (USA) LLC*
         on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
             28.  An address commission of *3.75% 2.1%* per cent payable to *Charterers_____* on the hire earned and paid under this Charter.

*Additional Clauses 29 to 81, Bimco Standard War Risks Clause for Timecharters - Code Name: "Conwartime 1993", New Jason Clause, General Clause Paramount and New both-to-Blame Collision Clause, all as attached, to be deemed part of and incorporated in this Charter Party and all bills of Lading issued hereunder.*

*OWNERS:*                                                    *CHARTERERS:*


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or and user as appropriate and not by the author.

Fax sent by : 12038531178          Atlas Shipping Ltd.          82/19/87  15:45   Pg: 6/14
11/61/2006 SUS 15:09  FAX    867200                                              @006/023

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

29.    Master/Owners to keep Charterers well advised of vessel's readiness to deliver.
       Owners to give Charterers 15/12/10/8/7/5/3/2/1 days notice of delivery date and
       port.

30.    Owners are obliged to deliver and keep the vessel, her crew and anything pertaining
       hereto supplied with up-to-date and complete certificates, approvals, equipment and
       fittings, enabling the vessel and her crew to load, carry and discharge all cargoes
       permitted under this Charter Party, and to receive bunkers within the trading limits
       of this Charter Party, even where such certificates, approvals, equipment and fittings,
       become necessary before or after the commencement of this Charter Party.

       It is the responsibility of the Master and the Owners to arrange for any special
       vaccination required at ports of call and to keep on board corresponding valid
       certificates.

       If Owners fail to comply herewith, any time lost and all extra expenses to be for
       Owners' account and Charterers may deduct same from the hire.

31.    Upon delivery, the vessel shall have on board an International Tonnage Certificate
       valid for the duration of this Charter Party.

32.    I.T.F. / Flag Restriction, Etc.
       Owners warrant that the officers and crew of the vessel are covered for the duration
       of this Charter Party by an I.T.F. Agreement or other Bona Fide Trade Union
       Agreement conforming to I.T.F. standards acceptable worldwide. Loss of time and
       extra expenses incurred as a result of non-compliance shall be for Owners' account
       and may be deducted from hire.

       The Owners are responsible for any loss of time or delay or restriction to the full
       working of the vessel resulting from any action that may be taken against the ship
       and/or the Owners by third parties for any reason whatsoever unless same is caused
       by neglect or omission or fault of the Charterers and/or their Agents. Any time lost
       as a consequence of any such action by third parties shall be considered as off-hire
       and shall be deducted from the hire.

       Any extra expenses resulting directly from such action shall be the responsibility of
       and paid for by the Owners or, in Charterers' option, shall be paid by the Charterers
       and provided Charterers have substantiated that such extra expenses have been
       incurred as a direct consequence of such I.T.F. action shall be deducted from the hire.

       Owners warrant that the vessel is not blacklisted by any country within the trading
       limits of this Charter Party.

33.    Owners warrant to provide for the vessel and maintain at their expense and carry on
       board the vessel a valid U.S. Coast Guard Certificate of Financial Responsibility as
       required under the U.S. Federal Water Quality Act and amendments thereto.
       Owners also warrant to have secured current certificates for other countries where
       similar guarantees are required. In no case shall Charterers be liable for any
       damages as a result of the Owners' failure to obtain the aforementioned certificates
       or the Owners' non-compliance with present or future water pollution legislation
       enacted by individual U.S. States or other countries. Time lost by non-compliance to
       be considered as off-hire.

- 1 -

PCL Ref: 5797
Additional Clauses to M/V "BOGNTRIKA NAREE" Charter Party dated Stamford, Connecticut October 23, 2006

34.     P. and I. Club / Cargo Claims:
        Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party. Entry shall include, but not be limited to, full cover for cargo claims of any nature.

        Vessel is presently entered with U.K. P. and I. Club.

        Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of February 1970, as amended May 1984 and September 1996, or any subsequent modification or replacement thereof. The party having paid the claim(s) shall submit same to the other party with supporting documents as soon as possible, and neither party shall between themselves refer to the 2 (two) years time limit as defence.

35.     Liability Insurance:
        The Charterers shall not be responsible for loss of life nor arrest or seizure and/or other objects arising from perils insured against by customary policies of insurance so far as the insurance policy rules permit and provided same not caused due to the act, neglect, default of Charterers and/or sub-Charterers or their servants/Agents.

36.     Trading Exclusions:
        Vessel to be employed in lawful trades for the carriage of lawful and harmless merchandise only between safe ports where vessel can safely lie always afloat and trading to be always specifically excluding Yugoslavia, Bosnia, Albania, Israel, Lebanon, Turkish occupied Cyprus, Libya, Zaire, Somalia, Iraq, N. Korea, Srilanka, Campuchea, Angola, Cabinda, Cuba, Liberia, Sierra Leone, Abkhazia; North & South Yemen, Belize, CIS Russian Far East, Georgia (Black Sea), Cameroon, Ethiopia and Eritrea, Amazon River, St. Lawrence River trading is okay if no ice but no trading West of Montreal and no Great Lakes. In case of trading to St. Lawrence waterways, but west of Montreal (no Lakes trading) Charterers to procure and pay for all ice advisories for navigation of vessel in St. Lawrence including all pilotages/tugs and additional ice levies and navigational dues as applicable and charged by St. Lawrence waterways. Vessel not required to force ice. If vessel has to follow an ice breaker then not to be the first vessel or the last vessel in the ice convoy. If on account of ice the Master considers it dangerous to remain at the loading or discharging port area/place for fear of the vessel being frozen in and/or damaged, he has liberty to sail to a convenient open safe place and await Charterers fresh instructions. It is understood that the Vessel remains on hire during such period. If any breach of IWL applicable for trading in St. Lawrence to be for Charterers account.

Countries/places where U.N. / U.S.A. sanctions and/or restrictions are in force and all war and/or warlike zones. Orders of Owners war risk underwriters are always to be followed.

Angola, Liberia, Sierra Leone, Cameroon, Ethiopia and Eritrea to be considered allowed by Owners on a case by case only and always subject to Owners' prior approval, which not to be unreasonably withheld.

-2-

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 23, 2006

35.    Trading Exclusions: (continued)
Basic war risk insurance to be for Owners' account. Any additional premium (which
to be arranged by Owners) for hull and machinery and officers/crew for trading to a
restricted area, including blocking and trapping insurance and crew war bonus to be
for Charterers' account and vessel to remain on full hire.

When trading to West African ports Charterers to provide armed guards during port
stays in these countries to protect the vessel, her crew and her cargo. When trading to
West African ports Charterers to first handle all cargo claims from third parties in
these countries, including putting up securities, if necessary, to prevent
arrest/detention of the vessel or to release the vessel from such arrest/detention.
Eventual claims to be settled between Owners/Charterers as per NYPE Interclub
Agreement as per Clause 31 in proforma CP.

Bangladesh and Yemen trading allowed but cargo shortage claim if any to be
handled by Charterers, including putting up security, if necessary, to prevent
arrest/detention of the vessel or to release the vessel from arrest or detention, and
vessel to remain on hire, eventual claims to be settled between Owners and
Charterers as per NYPE Interclub Agreement as per Clause 34.

Iraq permitted to trade but always subject to actual condition prevailing in Iraq with
Charterers paying for all additional war risk insurance as applicable and Charterers
to follow Owners' war risk underwriters' orders.

37.    Cargo Exclusions:
The following cargoes are excluded:

Livestock, radio and radioactive goods and its wastes, nuclear products, petroleum
and its products, asphalt, pitch, ammonium nitrate, turnings motor blocks,
quebracho, hides, acids, explosives, arms, ammunitions, direct reduced iron ore
pellets, inflammable goods, dangerous and injurious cargoes, creosote and creosoted
goods, sponge iron, black powder, blasting caps, tar, shavings, HBI saltpeter, Chilean
nitrate of soda (but fertilizer grade always allowed subject same not coming under
IMDG Code), quick lime, naphtha, calcium carbide, borax, silicon magnesium,
turpentine, carbon black, asbestos, calcium hypochloride, bitumen, detonators,
bombs, dynamite, war materials, caustic soda, expellers, fishmeal, ferrosilicon, copra,
scrap, sulphur, IMO/IMDG cargoes.

If concentrates are loaded, same to be loaded, stowed, carried and discharged
strictly in accordance with IMO and local rules and recommendations - after
discharging this cargo Charterers are to clean vessel s holds at their time and
expense to same condition as prior loading this cargo. If concentrates are loaded,
the moisture content of same to be within IMO transportable limits, and certificates
to be issued to this effect by an independent surveyor at the time of
shipment. If concentrates are loaded then the rate for intermediate hold
cleaning by crew to be USD 3850.00 per hold.

- 3 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

57.    Cargo Exclusions: (continued)
       Chrome ore not to be last 3 cargoes prior to redelivery.

       Charterers may load two cargo of non-oily shredded HMS 1 + 2 scrap per
       year, always excluding MBT. Same is to be loaded with following soft landing
       clause - no other type/form of scrap to be permitted.

       Soft Landing Clause:- Charterers/sub-Charterers and/or their
       stevedores/servants are to lower the cargo down softly, as close to the tanktops
       as possible, on the tanktops until a layer of cargo is built up at least to be about 2
       (two) metres height over the entire tank top area before proceeding to load in the
       normal manner. Master has the right to stop loading should stevedores/other
       loading personnel fail to comply with above and/or endanger the vessel and/or her
       equipments/fittings at any stage of loading. If shredded scrap is loaded then the rate
       for intermediate hold cleaning by crew to be USD $850.00 per hold. .

       Charterers may load two salt cargos per year. Same to be loaded, stowed,
       carried and discharged strictly in accordance with IMO and local rules and
       recommendations.

       Charterers are to lime wash vessel's holds at their time and expense prior
       loading salt and after discharge Charterers are to clean vessels holds to same
       condition as prior loading the cargo at their time and expense. Charterers' option to
       request crew assistance for lime-washing of holds and removal of lime-wash against
       paying Owners USD $600.00 per hold for each such lime-wash/removal in addition
       to the rates stipulated in the intermediate hold cleaning clause in this Charter Party.
       Crew to perform lime-washing of holds and removal of lime-wash provided
       shore/local/labour regulations and weather conditions permitting and always at
       Charterers' risk, time and costs. Charterers to provide lime at their time and
       expenses. Vessel/Owners/crew not responsible/liable in the event vessel fails
       subsequent hold inspections and for any consequences whatsoever resulting from
       this arrangement.

       Charterers may load two sulphur cargoes per year. Same to be loaded, stowed,
       carried and discharged strictly in accordance with IMO, flag state
       and local rules and recommendations including but not limited to all Solas
       regulations together with any and all protocols/amendments thereto. . Charterers
       are to lime wash vessel's holds at their time and expense prior
       loading sulphur and after discharge Charterers are to clean vessels holds to
       same condition as prior loading the cargo at their time and expense.
       Charterers' option to request crew assistance for lime-washing of holds and removal
       of lime-wash against paying Owners USD $600.00 per hold for each such lime-
       wash/removal in addition to the rates stipulated in the intermediate hold cleaning
       clause in this Charter Party. Crew to perform lime-washing of holds and removal of
       lime-wash provided shore/local/labour regulations and weather conditions
       permitting and always at Charterers' risk, time and expenses. Charterers to provide
       lime at their time and expenses. Vessel/Owners/crew not responsible/liable in the
       event vessel fails subsequent hold inspections and for any consequences
       whatsoever resulting from this arrangement.

- 6 -

Fax sent by : 12838531173          Atlas Shipping Ltd.          02/19/87   15:46    Pg: 18/14

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 19, 2005

37.     Cargo Exclusions: (continued)
        Charterers have the option to load two cargoes of cement per year.
        If cement is loaded then the rate for intermediate hold cleaning by crew to
        be USD $950.00 per hold.

        With the view to protect Owners and Charterers against possible claims for
        cargo damages, the Owners have the option to appoint surveyors nominated by
        their P and I club to perform cargo condition surveys concurrently with
        loading and discharging certain cargoes such as steel and other cargoes
        which are potentially liable to cargo claims.  Cost for such surveys to be shared
        equally between Owners and Charterers.

        Deck cargo clause:
        Charterers are entitled to load cargo on deck in accordance with normal marine
        practice and safety regulations and always subject to vessel's seaworthiness,
        strength, stability and safety of crew. Deck cargoes to be entirely at
        Charterers'/Shippers'/Receivers' risk, time and expense. Deck cargoes to be
        loaded, stowed, lashed and secured to master's satisfaction. Extra expenses and/or
        detention/deviation if any due to deck cargoes to be for Charterers' account. All
        Bills of Lading for deck cargoes to be claused "Shipped on deck at Charterers',
        Shippers' and Receivers' risk, expense and responsibility, without any liability on
        the part of the vessel or her Owners for any loss, damage, expense and/or delay
        howsoever caused. Charterers can make any and all fittings required for loading
        deck cargo. All fittings to be made according to class recommendations.

        Charterers' option to load during this Charter Party, maximum up to four cargoes of
        calcined petcoke (Calcined only, all other petcoke vis green/delayed is excluded in
        this Charter Party), each 12 months on the condition that Charterers undertake to
        pay Owners USD $1,000 per hold for each intermediate cleaning performed by crew
        after having loaded the calcined petcoke. Charterers to supply chemicals to
        wash/clean vessel's holds after calcined petcoke carriage to prepare holds for the
        next cargo.

        Charterers allowed to load 'chrome ore' but not as the last three cargoes prior
        redelivery.

        Logs Loading Clause:
        In the event Charterers load logs the following clauses to apply:

        Charterers are to load, stow, lash/unlash, secure, dunnage, tally and discharge the
        cargo free of risk and expense to the vessel/Owners.

        The Master shall supervise the stowage of the cargo and direct/control all
        loading, handling, stowing and discharge of the cargo.

        The vessel is to be loaded in accordance with the vessel's timber deck cargo loading
        manuals and IMO code of safe practice for ships carrying timber deck cargoes 1991.
        Such deck and/or hatch cargo is to be carried at Charterers' risk and is never to

- 5 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

37.     Cargo Exclusions: (continued)
exceed the vessel's deck and/or hatch strength. Any deck and/or hatch cargo is
always to be carried consistent with vessel's stability and loading manuals and
stowed, lashed and secured under the supervision of the Master and to Master's
satisfaction.

If requested by Charterers and provided local/shore/labour regulations and
weather conditions permit, vessels crew to perform setting up/down stanchions
and lashing/unlashing /relashing/mark off (materials and equipment for mark offs
to be supplied by Charterers at their expense) of cargo and these extra services to be
performed by vessel's crew entirely at Charterers' risk, expense and vessel to
remain fully on hire, Charterers to pay Owners USD $4,000.00 lumpsum for
these extra services by crew.

Bills of Lading for deck and hatch cargo are to be claused - "Carried on
deck/hatch covers at Charterers'/Shippers'/Receivers' risk and expense  without
any liability on the part of the vessel/Owners for any loss and/or damage
howsoever caused."

If logs are loaded then the rate for intermediate hold cleaning by crew to be
USD $1,000.00 per hold.

38.     Bunkers:
Bunkers on delivery about ▓▓▓▓ metric tons Intermediate Fuel Oil and about
▓▓▓▓ metric tons Marine Diesel Oil.

Bunker prices U.S.▓▓▓▓ per metric ton for Intermediate Fuel Oil and U.S.▓▓▓▓
per metric ton for Marine Diesel Oil.

Owners are allowed to bunker the vessel on their account at load port or en route
without interfering with Charterers' operation, last voyage only.

Charterers to pay for the value of bunkers on delivery with first hire payment.

Charterers may deduct value of estimated bunkers on redelivery from last sufficient
hire payment(s). Owners have the privilege to bunker the vessel for their own
account during the last or penultimate voyage of this Charter without interfering
with Charterers' operations.

39.     Weather Routing:
The Charterers may supply an independent Weather Routing Companies advice to
the Master during voyages specified by the Charterers. The Master shall comply
with the reporting procedure of the routing service selected by the Charterers.
Evidence of weather conditions shall be taken from the vessel's deck logs and the
weather routing companies' reports.  In the event of a consistent discrepancy
between the deck logs and the weather routing companies' reports, the latter shall be
taken as ruling. In the event of any speed claims fuel savings, if any, due to reduced
speed is to be considered and set off as credits against such claims. Charterers to
provide supporting documents to substantiate their speed claims if any and same to
be dealt with separately.

- 6 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

40.    Master's / Crew's Assistance:
       With reference to Clause 8 of this Charter Party, "customary assistance" shall mean
       all types of work which the Master and the crew would normally do when the ship is
       trading for the Owners' account such as, but not limited to:

       A)     All opening and closing of hatches, when and where required, if permitted by
              local regulations.
       B)     Deleted.
       C)     Deleted.
       D)     Warping alongside berths whenever required.

       The Master shall be responsible for all gear, equipment and/or stores supplied to the
       vessel by or for Charterers' account and the Master shall keep a record of all such
       gear, equipment and/or stores to be redelivered to the Charterers prior to redelivery
       of the vessel to the Owners or if required by the Charterers, at any time during the
       Charter in like good condition as supplied, fair wear and tear always excepted. The
       Owners shall make good any shortage and/or damage unaccounted for.

41.    Bill(s) of Lading:
       With reference to Clause 8, it is understood that the Charterers and/or their Agents
       may sign Bill(s) of Lading on Master's behalf provided same are in conformity with
       Mate's receipts, quantity loaded/discharged to be determined by draft survey.
       Through or in-Transit or Liner Bills of Lading not to be issued under this Charter
       Party. Neither the Charterers nor their agents shall permit the issue of any Bill of
       Lading, Waybill or other document evidencing a contract of carriage (whether or not
       signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-
       Charterers) incorporating the Hamburg Rules or any other legislation imposing
       liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify
       the Owners against any liability, loss or damage which may result from any breach
       of the foregoing provisions of this Clause.

42.    Supercargoes / Port Captains:
       The Charterers or their Supercargo(es) are entitled to call for speed trials, in ballast or
       loaded condition, indemnifying the Owners for any extra expenses in this
       connection. The Charterers and/or their supercargo(es) may install and remove, at
       their expense, such instruments as may be required to check the vessel's speed and
       revolutions of the main engine.

       The Charterers and/or their Supercargoes shall have free and unlimited access to the
       whole vessel including bridges, holds and engine room, and also to all vessel's tanks,
       including but not limited to, bunkers, lubricating oil, sludge, ballast and fresh water
       tanks. Whenever required, the Master must bring the vessel into even trim to ensure
       correct bunker soundings.

       The Charterers and/or their Supercargoes shall have free and unlimited access to the
       whole vessel including bridges, holds and engine room, and also to all vessel's tanks,
       including but not limited to, bunkers, lubricating oil, sludge, ballast and fresh water
       tanks. Whenever required, the Master must bring the vessel into even trim to ensure
       correct bunker soundings. The Charterers' and/or surveyors to have free and

- 7 -

Fax sent by : 12893531178        Atlas Shipping Ltd.        02/19/07    15:46    Pg: 13/14

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

42.    Supercargoes / Port Captains (continued)
unlimited access to the vessel's deck and engine log books, tank plans, calibration
scales and/or other plans as requested and are allowed to make copies of the original
log books on board or ashore.

Charterers have the right to inspect the vessel and do a full survey.

43.    If the Charterers have reason to be dissatisfied with the performance of the vessel,
the Owners, upon receiving complaints shall immediately investigate and take
appropriate steps to correct the situation.

44.    Stevedore Damages:
Charterers to be responsible for all damages caused to the vessel and/or her
equipments by stevedores and/or Charterers servants / Agents. Master to notify
Charterers or their Agents in writing / telex / cable of such damage within 24
(twenty-four) hours of occurrence, or in case of hidden damage as soon as practicable
after discovery of same but in any case prior to redelivery of the vessel.

Master to co-operate with Charterers or their Agents in notifying the party who
caused the damage and to hold them responsible. If requested by Charterers, Master
to co-operate with the Agents to arrange for a survey at Charterers time and expense
to define, estimate the extent of damage. Damages which affects vessel's
seaworthiness and/or class and/or working / trading capacity and/or safety of
crew to be repaired by Charterers without delay after each occurrence in Charterers'
time and costs. Such repairs to be carried out to class surveyor's approval.

Damages which do not affect vessel's seaworthiness and/or class and/or working /
trading capacity and/or safety of crew may be repaired during vessel's next regular
drydock concurrently with Owners work and Charterers to pay Owners the repair
costs against vouchers and also for the time (insofar as the time exceeds the time
necessary to carry out Owners work). Charterers have the right to be represented at
the time of repairs in drydock. Owners to give Charterers reasonable notice of same
as far as possible.

45.    Off-Hire:
After suspension of hire from any cause, the vessel shall be placed at Charterers'
disposal at the same port or position where hire was suspended.

During any off-hire period estimated to exceed 8 days, the Owners to give the
Charterers not less than 2 (two) days definite notice of resumption of the service.

If the vessel has been off-hire (for a period of 30 (thirty) consecutive days during this
Charter, the Charterers are at liberty to cancel the balance period of this Charter
Party and redelivery shall take place upon vessel being free of cargo.

46.    Punctual Payment / Breach of Charter
Before exercising the option of withdrawing the vessel from the Charter, the Owners
will give the Charterers 72 (seventy-two) hours, (Saturdays, Sundays and Holidays
excluded) official notice in writing, and will not withdraw the vessel if the hire is

- 8 -

Fax sent by : 12838531178        Atlas Shipping Ltd.        82/19/87   15:46   Pg: 14/14

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford.
Connection: October 18, 2006

46.  Punctual Payment / Breach of Charter: (continued)
paid or the alleged breach is rectified within the 72 (seventy-two) hours allowed for
notice from the time the Charterers received such notice.

The Charterers have the liberty to retain sufficient funds from any hire to cover
actual amounts, including substantiated off-hire and value of substantiated bunkers
on redelivery, for Owners' account.

Owners warrant that the Master will have sufficient cash on board the vessel to pay
Agents for all Owners' husbandry items and therefore Charterers will not deduct any
funds to cover any alleged estimated Owners' items.

47.  Deleted.

48.  Speeds
The Charterers may instruct the vessel to steam within the capabilities of vessel's
main engine. With reference to Lines 9 and 10 of this Charter Party, good weather
conditions is understood to mean all weather conditions not exceeding wind force
Beaufort 4.

49.  Lieu of Cleaning on Redelivery
With reference to Line 54, the Charterers have the liberty to redeliver the vessel with
unclean holds paying the Owners a lumpsum of U.S. ~~~~~~~~~~~~~~~~ and ~~~~~~~~~~~~~~~~
lumpsum in case last cargo is logs is in lieu of cleaning including disposal
dunnage/lashing materials/debris. However, if disposal of dunnage/lashing
materials/debris by shore labour obligatory then same to be arranged and paid by
Charterers.

50.  Intermediate Hold Cleaning Clause:
Intermediate hold cleanings to be performed by Charterers at their risk, time and
costs. However if requested by Charterers crew to perform same, provided
shore/local/labour regulations and weather conditions permitting, at Charterers'
risk, time and costs but vessel/Owners/crew not responsible/liable in the event
vessel fails subsequent hold inspections. Charterers to provide the required materials
for cleaning holds including fresh water. Charterers to pay owners ~~~~~~~ per
hold for sweeping only and ~~~~~~~ per hold for sweeping and washing, for
each such intermediate hold cleaning performed by crew.

Throughout the currency of this Charter Party the Charterers shall remain
responsible for all costs and time, including deviation, if any, associated with the
removal and disposal of cargo related residues and/or hold washing water and/or
chemicals and detergents and/or waste as defined by Marpol Annex V, Section 1 or
other applicable rules relating to the disposal of such substances except on redelivery
where ILOHC applies

-9-

Fax sent by  : 12038531178          Atlas Shipping Ltd.          02/19/27    15:56    Pg: 2/15
11/17/2006 TUE 16:14  FAX  @0200

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford.
Connecticut October 13, 2006

**51.** **Fittings:**
Charterers to have the option to weld padeyes and/or other lashing / securing
devices / points at their expense and subject to the Master's approval which not to
be unreasonably withheld. Charterers to remove all such padeyes and/or other
lashing / securing devices / points prior to redelivery if required by Owners.

**52.** **Vessel's Description:**
(All details 'about', and without guarantee given in good faith)

M.V. BONTRIKA NAREE Vessel description to be attached as follows:
BUILT 18 DECEMBER 1990 AT KANASASHI SHIPBUILDING CO., JAPAN
EX NAMES, "PORT STAR". TYPE LOG/BULKER
FLAG: THAI. POR: BANGKOK. OFFICIAL NO. 4010 00641, IMO NO. 8914738
CALL SIGN - HSPDZ
INMARSAT C TLX: 456718710 INMARSAT A: 1567156
CLASS - NK NS (BULK CARRIER) MNS NO: 903062
DWT / DRAFT
SUMMER:              27881 MT / 9.424 M
WINTER:               27107 MT / 9.218 M
TROPICAL:            28657 MT / 9.630 M
LUMBER SUMMER:  28008 MT / 9.673 M
LUMBER WINTER:   27845 MT / 9.405 M
LUMBER TROPICAL:        29707 MT / 9.874 M
LOADED TPC - 39.55 MT FWA: 214 MM
LOA -176.60/LBP-169.40 / BEAM-25.00M/MOULDED DEPTH - 13.30 M
AIR DRAFT FM KEEL: 41.0 M
GT/NT - 17066 / 9904
SUEZ GT/NT - 17524.66 / 15719.83
(SCNT DURING ONE OF HER TRANSIT WAS 16401.28 SCID NO: 23639 SINCE
SUEZ CANAL NT DEPENDS ON VARIBLE FACTORS CHARTS TO CONFIRM
WITH THEIR AGENTS FOR THE ACTUAL SCNT FOR THE TRANSIT)
PANAMA NT: 14253, PANAMA SIN NO. 389528
HO/HA - 5/5. GEAR - 4 CRANES OF 30 MT EA. OUTREACH
ABOUT 8.0 M
HATCH OPENINGS –
NO.1: 17.94 X 12.50
NO.2: 19.50 X 17.82
NO.3: 19.50 X 17.82
NO.4: 19.50 X 17.82
NO.5: 19.50 X 17.82
HATCHCOVERS - FOLDING TYPE - HYDRAULIC
GRAIN / BALE - IN CBFT - 1,350,409 / 1,317,709
CUBIC BREAKDOWN -
GRAIN NO 1 - 225, 372/2 - 288, 045/3 - 288, 420/4-288, 429/5 -250, 153
BALE NO 1 - 220, 903/2 - 280, 656/3 - 281, 484/4 - 280, 979/5 - 253, 685
HOLD DIMENSIONS (L X B (F, A) AT TANKTOP X HT UP TO COAMING INMSTERS)
(ALL ABOUT)
NO. 1, 27, 58 X 4.99, 19.55 X 11.75 M

- 10 -

PCL Ref: 5737
Additional Clauses to M/V "BOONTHIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

52. Vessel's Description: (continued)
   NO. 2 3 AND 4 27.58 X 19.6 X 11.75 M
   NO. 5 27.75 X 19.60. 7.52 X 11.75 M
   HEIGHT OF HATCH COAMING: ABOUT 1.9M
   STEEL STANCHIONS
   COLLAPSIBLE: #1 - 6.50 MTRS HIGH #2, 3, 4, 5 - 8.0 MTRS HIGH
   AUSSIE FITTED, GRAIN FITTED, LOG FITTED
   STRENGTHS - IN MT / M2
   MAIN DECK - 4.0 MAIN DECK HATCHES - 3.0, TANKTOP - 15.00
   SPEED CONSUMPTION -
   ABOUT 13.25 KNOTS ON ABOUT 22 MTS IFO 380 CST + 1.5 MTS MDO
   IN PORT IDLE/WWW - ABOUT 1.5 MTS MDO / ABOUT 2.5 MTS MDO
   ABOVE SPEED WARRANTY FOR GOOD WEATHER UP TO BEAUFORT
   WIND FORCE 4 AND DOUGLAS SEA STATE 3
   VESSEL CONSUMES MDO IN MAIN ENGINES WHILE MANOEUVERING
   IN/OUT OF PORTS, CANALS, RIVERS, NARROW WATERS, FOGS, ETC.
   BUNKER SPECS:
   FUEL OIL 380 CST SPECS: ISO 8217: 1996 ISO-F-RMG35
   DIESEL OIL SPECS 380 CST SPECS: ISO 8217: 1996(E) ISO-F-DM3
   P & I CLUB - U.K. P N I CLUB / H+H VALUE - USD 12.50 MILLION
   OWNERS: PRECIOUS OCEANS LIMITED, BANGKOK
   IF VESSEL LOADS TO FULL DWT CAPACITY WITH HIGH DENSITY
   CARGOES (I.E. CARGOES STOWING LESS THAN 55 CFT/MT), THEN
   VESSEL TO BE LOADED HOMOGENEOUSLY.
   CHARTERERS TO HAVE THE RIGHT TO DO A FULL CONDITION SURVEY.
   OWNERS TO GIVE ALL ACCESS AND ASSISTANCE TO CHARTERERS INSPECTORS
   AND SAME TO BE FOR CHARTERERS ACCOUNT.

53. Banking Details:



PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

54.    Deleted.

55.    Charterers confirm that they will have a full liability cover for the entire duration of
       the Charter.

56.    Deleted.

57.    Bimco Standard Law and Arbitration Clause 1998–English Law.
       London Arbitration:
       This Contract shall be governed by and construed in accordance with English Law
       and any dispute arising out of or in connection with this Contract shall be referred
       arbitration, in London, in accordance with the Arbitration Act 1996 or any statutory
       modification or re-enactment thereof save to the extent necessary to give effect to the
       provisions of this Clause. The arbitration shall be conducted in accordance with the
       London Maritime Arbitrators Association (LMAA) terms current at the time when
       the arbitration proceedings are commenced.

       The reference shall be to three arbitrators. A party wishing to refer a dispute to
       arbitration shall appoint its arbitrator and send notice of such appointment in
       writing to the other party requiring the other party to appoint its own arbitrator
       within 14 calendar days of that notice and stating that it will appoint its arbitrator as
       sole arbitrator unless the other party appoints its own arbitrator and gives notice that
       it has done so within the 14 days specified. If the other party does not appoint its
       own arbitrator and give notice that it has done so within the 14 days specified, the
       party referring a dispute to arbitration may, without the requirement of any further
       prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise
       the other party accordingly. The award of a sole arbitrator shall be binding on both
       parties as if he has been appointed by agreement. Nothing herein shall prevent the
       parties agreeing in writing to vary these provisions to provide for the appointment of
       a sole arbitrator.

       In cases where neither the claim nor any counter-claim exceeds the sum of U.S.
       $100,000 (or such other sum as the parties may agree) the arbitration shall be
       conducted in accordance with the LMAA Small Claims Procedure current at the
       time.

58.    Deleted.

59.    Deleted.

60.    Bunker Survey Clause:
       Charterers have the option to call for a joint bunker survey upon delivery or after
       arrival at first loadport after delivery and/or upon redelivery or at last port before
       redelivery, in order to establish bunker figures upon delivery, respectively redelivery
       and such figures shall be final and binding for both parties.

       The Charterers will be represented by their supercargo(es) or appointed surveyor(s)
       and the Owners by the Master and/or Chief Engineer. Time for joint bunker survey
       upon delivery or after arrival at first loadport after delivery to be for Charterers'
       account and time for joint bunker survey upon redelivery or at last port before
       redelivery to be for Owners' account. Costs for surveys to be split 50/50 between
       Owners and Charterers.

- 12 -

Fax sent by  : 12039531170          Atlas Shipping Ltd.          02/19/87  15:56  Pg: 5/15
11/8?/2006 TUE 16:15  FAX  93?409

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

61.  On/Off-Hire Condition Survey Clause:
     Charterers have the option to call for an on/off-hire condition survey and/or an
     on/off-hire condition survey upon delivery or after arrival at first loadport after
     delivery and upon redelivery or at last port(s) before redelivery but same will only
     be performed on Charterers' request or in the event of any stevedore or other
     damage to the vessel during this Charter time and costs for such surveys to be split
     50/50 between Owners and Charterers.

62.  Hatch Test:
     Charterers to have the option to hose test or ultra sonic test the vessel's hatchcovers
     at the loading port(s) at their time/expense and should same not be watertight
     Owners have the right to arrange necessary measurements in order to make
     hatchcovers fully watertight. Owners shall be given by Charterers three working
     days after which if the hatchcovers are not watertight Charterers have the right to
     cancel this Charter Party and redeliver the same, provided no cargoes on board.

63.  Steel Clause:
     In the event that steel cargo is loaded under the Charter Party, the Charterers have
     the option to appoint a surveyor through their P. and I. Club to carry out a pre-
     loading condition survey on the cargo. If this option is exercised and provided
     Charterers P. and I. Club Surveyors are acceptable to Owners P. and I. Club then the
     cost of such survey is to be shared equally between Owners and Charterers, and
     Charterers to provide Owners a copy of the relevant survey report.

     Charterers to have the option to load cargo on vessel's deck/hatchcovers which not
     to exceed respective strengths and always to subject to vessel's
     stability/seaworthiness and always at Charterers risk/expense. Bill(s) of Lading for
     deck cargoes to be claused "Shipped on deck at Charterers / Shippers risk and
     expense. Owners/vessel not responsible for any loss and/or damage howsoever
     caused".

     Charterers to supply, and crew to apply, ramnek tape on all hatches provided
     shore/local regulations permit.

     Charterers' option to install de-humidifying units in holds at their cost and time.

64.  Discharge of Cargo without Original Bill(s) of Lading:
     Owners to comply with laws/customs of countries calling for discharge of cargo into
     customs custody but only delivery by customs to consignees against consignees
     handling customs the original Bill of Lading.  Charterers to furnish Owners with
     Letter of Indemnity in Owners' P and I Club wordings for discharge of cargo into
     customs custody without production of original Bills of Lading.

     If no original Bills of Lading are available at any discharge ports, the Owners will,
     upon specific request from Charterers on each occasion permit delivery.  In such
     cases, Letter of Indemnity in Owners' P. and I. Club wordings to be issued and
     signed by Charterers only. Charterers undertake that original Bills of Lading are
     forwarded to Owners as soon as possible.

- 13 -

Fax sent by  : 12808531178          Atlas Shipping Ltd.          02/19/07   15:56     Pg:  5/15
11/23/2006  702 16:17  FAX  parace

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

65.   I.S.M. Code:
From the date of coming into force of the International Safety Management (ISM)
Code in relation to the vessel and thereafter during the currency of this Charter
Party, the Owners shall procure that both the vessel and "the Company" (as defined
by the ISM Code) shall comply with the requirements of the ISM Code.  Upon
request the Owners shall provide a copy of the relevant Document of Compliance
(DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay
caused by the failure on the part of the Owners or "the Company" to comply with
the ISM Code shall be for the Owners' account.

66.   Hold Condition:
On arrival at first loading port after delivery vessel's holds to be clean, swept
washed down by fresh water and dried up so as to receive/carry Charterers'
intended cargoes in all respects free of salt, rust scale and previous cargo residues to
the satisfaction holds not be approved by the surveyor's then vessel to be
placed off-hire from the time of such rejection until vessel's holds pass the
same inspection again and any directly related extra expenses for cleaning
holds to be for Owners' account.

67.   Owners confirm vessel is free of Asian Gypsy Moth.

68.   Deleted.

69.   Vessel is in all respects suitable for grab loading/discharging.

70.   Deleted.

71.   Should the vessel stay in a port or trade in tropical waters for any period exceeding
45 consecutive days Owners are not to be held responsible for any deficiency in
speed/consumption due to bottom fouling by marine growth, barnacles etc. and
Charterers to ensure vessel's bottom is cleaned with approved equipments at
Charterers' time and expense. In case Charterers have cleaned vessel's bottom, the
Charter Party S/C to be applicable again from the time the cleaning was completed.
However, actual cause/extent of such bottom fouling to be ascertained by joint
underwater survey by mutually agreed independent Marine Surveyor.

72.   If required by U.S. authority then following 'liner trade' clause to apply:

If loading cargo destined for the U.S. or passing through U.S. ports in transit, the
Charterers shall submit a cargo declaration directly to the U.S. customs. In all
circumstances, the cargo declaration must be submitted to the U.S. customs latest 24
hours in advance of loading. The Charterers assume liability for and shall
indemnify, defend and hold harmless the owners against any loss and/or damage
whatsoever (including consequential loss and/or damage) and any expenses, fines,
penalties and all other claims of whatsoever nature, including but not limited to legal
costs, arising from the Charterers' failure to comply with above. If the vessel is
detained, attached, seized or arrested as a result of the Charterers' failure to comply
with above, the Charterers shall provide a bond or other security to ensure the
prompt release of the vessel.

- 14 -

Fax sent by : 12833531178        Atlas Shipping Ltd.        82/19/27   15:56   Pg: 7/15
11/07/2006 TUE 16:17  FAX perabo

PCL Ref. 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2005

73.    The vessel shall during the duration of this Charter Party not be sold, break
up and change flag, class, P and I, name, without Charterers' prior approval,
which not to be withheld unreasonably.

74.    BIMCO ISPS CLAUSE FOR TIMECHARTER PARTIES 2005

(a) (i)    The Owners shall comply with the requirements of the International
Code for the Security of Ships and of Port Facilities and the relevant
amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and
"the Company" (as defined by the ISPS Code). If trading to or from the United
States or passing through United States waters, the Owners shall also comply with
the requirements of the  US Maritime Transportation Security Act 2002 (MTSA)
relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)    Upon request the Owners shall provide the Charterers with a copy of
the relevant International Ship Security Certificate (or the Interim  International Ship
Security Certificate) and the full style contact details of the Company Security
Officer (CSO).

(iii )  Loss, damages, expense or delay (excluding consequential loss,
damages, expense or delay) caused by failure on the part of the Owners or
"the Company"/Owners" to comply with the requirements of the ISPS
Code/MTSA or this Clause shall be for the Owners' account, except as
otherwise provided in this Charter Party.

(b)    (i) The Charterers shall provide the Owners and the Master with the full
style contact details and, upon request, any other information the Owners
require to comply with the ISPS Code/MTSA.

(ii)  Loss, damages or expense (excluding consequential loss, damages or
expense) caused by failure on the part of the Charterers to comply with this
Clause shall be for the Charterers' account, except as otherwise provide in
this Charter Party, and any delay caused by such failure shall count as
laytime or time on demurrage.

(c)    Provided that the delay is not caused by the Owners' failure to comply
with their obligations under the ISPS Code/MTSA, the following shall
apply:

(i) Notwithstanding anything to the contrary provided in this Charter
Party, the Vessel shall be entitled to tender Notice of Readiness even if not
cleared due to applicable security regulations or measures imposed by a
port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by
any relevant authority under the ISPS Code/MTSA shall count as laytime or
time on demurrage, unless such measures result solely from the negligence
of the Owners, Master or crew or the previous trading of the Vessel, the
nationality of the crew or the identity of the Owners' managers.

- 15 -

Fax sent by   : 12039531170           Atlas Shipping Ltd.              02/15/07   15:56   Pg: 8/15
11/07/2006 TUE 15:18  FAX  p00009

PCL Ref. 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 18, 2006

74.  BIMCO ISPS CLAUSE FOR TIMECHARTER PARTIES 2005 (continued)

(c)    Notwithstanding anything to the contrary provided in this Charter Party, any costs
or expenses whatsoever solely arising out of or related to security regulations or
measures required by the port facility or any relevant authority in accordance with
the ISPS Code/MTSA including, but not limited to, security guards, launch
services, vessel escorts, security fees or taxes and inspections, shall be for the
Charterers' account, unless such costs or expenses result solely from the negligence
of the Owners, Master or crew or the previous trading of the Vessel, the nationality
of the crew or the identity of the Owners' managers. All measures required by the
Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e)    If either party makes any payment which is for the other party's account  according
to this Clause, the other party shall indemnify the paying party.

75.  Double Banking Clause
Charterers shall have the option of ordering the vessel to lie alongside other
vessels/coasters/lighters at any safe anchorage without swell and/or safe berth/safe
dock/safe wharf for the purpose of loading/discharging of the cargo and/or for bunkering,
but always subject to Masters absolute discretion whether such operations are safe and
feasible. The Master may if he considers it at anytime unsafe to commence or continue such
operations order the other vessels/coasters/lighters away from his vessel to a safe distance
and such vessels/coasters/lighters must obey such orders. Master may also remove his
vessel to a safe distance. Charterers shall supply adequate and proper fenders, lines and
securing equipment acceptable to the Master and shall also be liable for any damage caused
to the vessel by the other vessels/coasters/lighters during approach, securing, lying
alongside, unsecuring and departure of the other vessels/coasters/lighters provided the
Master has notified

Charterers or their agents of such damage in writing/telex/cable. Final and sole authority
for placing of fenders shall always remain with the Master of the vessel. The Master shall at
all times give full cooperation to Charterers and/or their agents to expedite the
loading/discharging.

All above operations to be at Charterers' entire risk, time and costs.

Extra insurance if required for any/all of the above operations to be for Charterers account
and Charterers to pay Owners same against Owners providing their underwriters/brokers
invoice.

Delivery overside into other vessels/coasters/lighters in the case of discharging to
constitute right and true delivery of cargo under the relative bills of lading.

76.  Ice Clause
The vessel not to be ordered to nor bound to enter or remain in any icebound port
place/area or any port, place/area where lights, lightships, marks and buoys are or are
likely to be withdrawn by reason of ice or where there is risk that in the ordinary course of
things the vessel will not be able on account of ice to safely reach, enter and remain in
the port, area/place or to get out after having completed loading or discharging.

- 16 -

Fax sent by  : 12838531178          Atlas Shipping Ltd.          02/19/07   15:56   Pg: 9/15
11/07/2005 TUE 16:18  FAX  002400

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

76. Ice Clause (continued)
The vessel not to be obliged to force ice but may follow ice-breakers in convoy provided
vessel is not the first or the last vessel in the convoy. Ice-breakers, ice advisors to be for
Charterers' account. If on account of ice the Master considers it dangerous to remain at the
loading, or discharging port, area/place for fear of the vessel being frozen in and/or
damaged, he has liberty to sail to a convenient open safe place and await Charterers fresh
instructions. It is understood that the vessel remains on hire during such period."

77. Termination on Bankruptcy of Either Chartering Party
The following provision shall apply to this Charter party only if there is not in force between
the parties an effective netting agreement in respect of all outstanding Transactions (as
defined below) between them. The provision shall not apply to, or be incorporated in any
Bill of Lading.

(a)  The parties to this Charter Party agree that if at any time a Bankruptcy Event (as defined
below) occurs in relation to either of them (the "Defaulting Party"), the other party (the
"non-Defaulting Party") may be not more than 20 days' notice to the Defaulting Party
designate a close-out date in respect of all Transactions then outstanding between them on
which the process set out in paragraph (b) shall occur (subject o paragraph(c) below).

(b)  As of the close-out date (i) all performance obligations of the parties under outstanding
Transactions shall terminate (ii) the Non-Defaulting Party shall promptly calculate its Loss
(as described below) in respect of each Transaction (iii) the Losses so calculated shall be
aggregated and netted to the greatest extent possible (and, in order to effect this, the Non-
Defaulting Party may convert any such Losses at commercially reasonable rates into such
currency as may be required) and (iv) the next resulting amount, if positive, shall be paid by
the Defaulting party to the non-Defaulting party within 3 days of the close-out date. If the
net resulting amount is negative, no amount shall be due from or payable by either party to
the other. Interest on the net resulting amount shall accrue at the rate of overnight LIBOR
plus 5% if such amount is not paid when due.

(c)  A close-out date (as described above) shall occur automatically as of the time
immediately before the start of a Bankruptcy Event specified in paragraph (1), (3), (4), (5), (6)
or, to the extent analogous, (8) of the definition

(d)  The parties to this Charter Party acknowledge and agree that the Transactions between
them form a single agreement and have entered into the Transaction on this basis.

78. Set-Off
Following a default by either party hereunder (the "Defaulting Party") the other party (the
"non-Defaulting Party") shall be entitled, at its option, to set-off any amounts believed in
good faith and on reasonable grounds by the Non-Defaulting Party to be payable (whether
under this Contract or otherwise), against any amounts believed in good faith and on
reasonable grounds by the Non-Defaulting Party to be payable (whether at such time or in
the future or upon the occurrence of a contingency) by the Defaulting party to the Non-
Defaulting party (whether under this contract or otherwise, against any amounts believed in
good faith and on reasonable grounds by the Non-Defaulting Party (whether under this
Contract or otherwise), irrespective of the currency, place of payment or booking office of
either party's obligations and the parties respective obligations shall be discharged promptly
and in all respects to the extent they are so set-off to be affected under this provision. For

- 17 -

FCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2005

**78. Set-Off (continued)**

this purpose, any such amount payable by one party to the other (or the relevant portion of
such amount) may be converted by the Non-Defaulting Party, acting in good faith and in a
commercially reasonable manner, into such currency as may reasonable be required in a
commercially reasonable manner. If an obligation is unascertained, the Non-Defaulting
Party may in good faith estimate that obligation and set-off in respect of the estimate subject
to the relevant party accounting to the other when the obligation is ascertained. The right of
the Non-Defaulting Party under this provision shall apply without prejudice to Clause 77 or
any other right of set-off which it may have whether by agreement, operation of law or
otherwise. Nothing in this provision shall be effective to create a charge or other security
interest

**79. U.S. Customs Advance Notification / AMS Clause for Time Charter Parties**

(A)  If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports
     in transit, the Charterers shall comply with the current U.S. customs Regulations (19
     CFR 4.7) or any subsequent amendments thereto and shall undertake the role of
     carrier for the purpose of such regulations and shall, in their own name, time and
     expense,

     i)      Have in place a SCAC (Standard Carrier Alpha code);
     ii)     Have in place an ICB (International Carrier Bond);
     iii)    Provide the Owners with a timely confirmation of i) and ii) above; and
     iv)     Submit a cargo declaration by AMS (Automated Manifest System) to the
             U.S.Customs and provide the Owners at the same time with a copy thereof.

(B)  The Charterers assume liability for and shall indemnify, defend and hold harmless
     the Owners against any loss and/or damage whatsoever (including consequential
     loss and/or damage) and/or any expenses, fines, penalties and all other claims of
     whatsoever nature, including but not limited to legal costs, arising from the
     Charterers' failure to comply with any of the provisions of sub-clause (A).
     Should such failure result in any delay then, notwithstanding any provision
     in this Charter party to the contrary, the Vessel shall remain on hire.

(C)  If the Charterers' ICB is used to meet any penalties, duties, taxes or other
     charges which are solely the responsibility of the Owners, the Owners shall
     promptly reimburse the Charterers for those amounts.

(D)  The assumption of the role as carrier by the Charterers pursuant to this
     Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7)
     shall be without prejudice to the identity of carrier under any Bill of Lading,
     other contract, law or regulation

**80. BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**

(a)  Without prejudice to anything else contained in this Charter Party, the Charterers shall
     supply fuels of such specifications and grades to permit the Vessel, at all times, to
     comply with the maximum sulphur content requirements of any emission control zone
     when the Vessel is ordered to trade within that zone.

- 18 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

80. BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005 (con't)
The Charterers also warrant that any bunker suppliers, bunker craft operators and
bunker surveyors used by the Charterers to supply such fuels shall comply with
Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of
sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any
loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers'
failure to comply with this Sub-Clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the
supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with
the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when
ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the
Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses
arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of
MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in
MARPOL Annex VI and/or zones regulated by regional and/or national authorities
such as, but not limited to, the EU and the US Environmental Protection Agency.

81. Charterers to comply with any/all United States Department of Agriculture's (USDA)
Animal and Plant Health Inspection Service (APHIS) Import Regulation for Wood
Packaging Material (WPM). Any/all consequences, loss, damages, expense or delay caused
by the failure on the part of the Charterers to comply with above regulation and/or
requirements shall be for Charterers account.

82. BIMCO Stowaways Clause for Time Charters
(a)(i) The Charterers warrant to exercise due care and diligence in preventing
stowaways in gaining access to the vessel by means of secreting away in the goods and/or
containers shipped by the Charterers.
(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have
gained access to the vessel by means of secreting away in the goods and/or containers
shipped by the Charterers, this shall amount to breach of Charter for the consequences of
which the Charterers shall be liable and shall hold the Owners harmless and shall keep them
indemnified against all claims whatsoever which may arise and be made against them.
Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including
fines, shall be for the Charterers' account and the vessel shall remain on hire.
(iii) Should the vessel be arrested as a result of the Charterers' breach of Charter according
to sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that,
within a reasonable time, the vessel is released and at their expense put up bail to secure
release of the vessel.

- 19 -

Fax sent by : 12230531178          Atlas Shipping Ltd.          02/19/07   15:56    Pg: 12/15

FCL Ref: 5797
Additional Clauses to M/V "BOGNIRIKA NARBE" Charter Party dated Stamford,
Connecticut October 13, 2005

82.  BIMCO Stowaways Clause for Time Charters (continued)
(b)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have
gained access to the vessel by means other than secreting away in the goods and/or containers
shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred,
including fines, shall be for the owners' account and the vessel shall be off hire.
(ii) Should the vessel be arrested as a result of stowaways having gained access to the vessel
by means other than secreting away in the goods and/or containers shipped by the
Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable
time, the vessel is released and at their expense put up bail to secure release of the vessel.

Fax sent by  : 12038531178          Atlas Shipping Ltd.          02/19/07   15:56     Pg: 13/15
11/377 2006 TUE 07:21" FAX  panaco                                              Z 013/015

PCL Ref: 5797

Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter
Party falls to be determined in accordance with the laws of the United States of America, the
following clause shall apply :-

### BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other
ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier
in the navigation or in the management of the ship, the owners of the goods carried
hereunder will indemnify the carrier against all loss or liability to the other or non-carrying
ship or her owners in so far as such loss or liability represents loss of or damage to or any
claim whatsoever of the owners of the said goods, paid or payable by the other or non-
carrying ship or her owners to the owners of the said goods and set off, recouped or
recovered by the other or non-carrying ship or her owners as part of their claim against the
carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of
any ship or ships or objects other than, or in addition to, the colliding ships or objects are at
fault in respect to a collision or contact."

and the charterers shall procure that all Bills of Lading issued under this Charter Party shall
contain the same clause.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where
the adjustment is made in accordance with the law and practice of the United States of
America, the following clause shall apply :-

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of
the voyage, resulting from any cause whatsoever, whether due to negligence or not, for
which, or for the consequence of which, the carrier is not responsible, by statute, contract or
otherwise, the goods, shippers, consignees or owners of the goods, shall contribute with the
carrier in general average to the payment of any sacrifices, losses or expenses of a general
average nature that may be made or incurred and shall pay salvage and special charges
incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if
the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents
may deem sufficient to cover the estimated contribution of the goods and any salvage and
special charges thereon shall, if required be made by the goods, shippers, consignees or
owners of the goods to the carrier before delivery."

- 21 -

PCL Ref: 5797
Additional Clauses to M/V "BOONTRIKA NAREE" Charter Party dated Stamford,
Connecticut October 13, 2006

WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CODE NAME: CONWARTIME 2004)

(a)     For the purpose of this Clause, the words:

(i)     'Owners' shall include the shipowners, bareboat charterers, disponent owners,
managers or other operators who are charged with the management of the Vessel, and the
Master; and

(ii)    'War Risks' shall include any war (whether actual or threatened), act of war, civil
war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of
mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or
malicious damage, blockades (whether imposed against all vessels or imposed selectively
against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise
howsoever), by any person, body, terrorist or political group, or the Government of any state
whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be
dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other
persons on board the Vessel.

(b)     The Vessel, unless the written consent of the Owners be first obtained, shall not be
ordered to or required to continue to or through, any port, place, area or zone (whether of
land or sea); or any waterway or canal, where it appears that the Vessel, her cargo, crew or
other persons on board the Vessel, in the reasonable judgement of the Master and/or the
Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any
such place as aforesaid, which only become dangerous, or is likely to be or to become
dangerous, after her entry into it, she shall be at liberty to leave it.

(c)     The Vessel shall not be required to load contraband cargo, or to pass through any
blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any
way whatsoever against vessel of certain flags or ownership, or against certain cargoes or
crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is
likely to be subject to a belligerent right of search and/or confiscation.

(d) (i)  The Owners may effect war risks insurance in respect of Hull and Machinery of the
Vessel and their other interests (including, but not limited to, loss of earnings and detention,
the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof
shall be for their account.

(ii)     If the Underwriters of such insurance should require payment of premiums and/or
calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and
remain within, any area or areas which are specified by such Underwriters as being subject
to additional premiums because of War Risks, then such premiums and/or calls shall be
reimbursed by the Charterers to the Owners at the same time as the next payment of hire is
due.

- 22 -

PCL Ref: 5797
Additional Clauses to M/V "SOONTRIKA NAREH" Charter Party dated Stamford,
Connecticut October 23, 2006

(e)    If the Owners become liable under the terms of employment to pay to the crew any
bonus or additional wages in respect of sailing into an area which is dangerous in the
manner defined by the said terms, then such bonus or additional wages be reimbursed
to the Owners by the Charterers at the same time as the next payment of hire is due.

(f)    The Vessel shall have liberty:-
to comply with all orders, directions, recommendations or advice as to departure, arrival,
routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery,
or in any other way whatsoever, which are given by the Government of the Nation under
whose flag the Vessel sails, or other Government to whose laws the Owners are subject or
any other Government, body or group whatsoever acting with the power to compel
compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risk underwriters
who have the authority to give the same under the terms of the war risk insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United
Nations, any directives of the European Community, the effective orders of any other
Supranational body which has the right to issue and give the same, and with national laws
aimed at enforcing the same to which the Owners are subject, and to obey the orders and
directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel
liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board
the Vessel when there is reason to believe that they may be subject to internment,
imprisonment or other sanctions.

(g)  If in accordance with their rights under the foregoing provisions of this Clause, the
Owners shall refuse to proceed to the loading or discharging ports, or anyone or more of
them, they shall immediately inform the Charterers. No cargo shall be discharged at any
alternative port without first giving the Charterers notice of the Owners' intention to do so
and requesting them to nominate a safe port for such discharge. Failing such nomination by
the Charterer within 48 hours of the receipt of such notice and request, the Owners may
discharge the cargo at any safe port of their own choice.

(h)  If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause
anything is done or not done, such shall not be deemed a deviation, but shall be considered
as due fulfilment of this Charter Party.

## GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the
carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in
the International Convention, dated Brussels, 25th August, 1924 and which is compulsorily
applicable to the contract of carriage herein contained. Such legislation shall be deemed to
be incorporated herein, but nothing herein contained shall be deemed a surrender by the
Carrier of any of its rights or immunities or an increase of any of its responsibilities or
liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to
any legislation by this clause incorporated, such term shall be void to that extent
but no further. Nothing in this Bill of Lading shall operate to limit or deprive the
Carrier of any statutory protection or exemption from, or limitation of, liability.

- 23 -

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NORWEGIAN BULK TRANSPORT A/S,                      :
                                                    :
                          Plaintiff,                :        08 Civ.
                                                    :
            - against -                             :        ECF CASE
                                                    :
PIONEER NAVIGATION LTD.,                            :
                                                    :
                          Defendant.                :
-------------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut    )
                        )    ss: Town of Southport
County of Fairfield     )

    Charles E. Murphy, being duly sworn, deposes and says:

    1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANT IS NOT PRESENT IN THE DISTRICT

    2.    I have attempted to locate the Defendant, PIONEER NAVIGATION LTD.,

within this District. As part of my investigation to locate the Defendant within this District, I

checked the telephone company information directory, as well as the white and yellow pages for

New York listed on the Internet or World Wide Web, and did not find any listing for the

Defendant. I also performed a Google search on the Internet. Finally, I checked the New York

State Department of Corporations' online database which showed no listings or registration for

the Defendant.

3.    I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

**PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER**

5.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Maritime Attachment and Garnishment and/or the Verified Complaint, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendant.

6.    Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

7.    To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple

-3-

delivery of the Process of Maritime Attachment and Garnishment to the various garnishes to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

8.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

9.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, to authorize service of process via facsimile or e-mail following initial *in personam* service.

Charles E. Murphy

Sworn and subscribed to before me
This 20th day of June 2008.

Notary Public/Commissioner of Superior Court

—3—

# EXHIBIT
# 2

08 CV 5591

RECEIVED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NORWEGIAN BULK TRANSPORT A/S,                    :

                   Plaintiff,               :         08 Civ.

     - against -                              :         ECF

PIONEER NAVIGATION, LTD.                          :

                Defendant.               :
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/24/08

### EX PARTE ORDER FOR PROCESS OF MARITIME ATTACHMENT

    **WHEREAS**, on June 20, 2008 Plaintiff, NORWEGIAN BULK TRANSPORT A/S, filed

a Verified Complaint, herein for damages amounting to **$77,379.38** inclusive of interest, costs

and reasonable attorney's fee, and praying for the issuance of Process of Maritime Attachment

and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty

and Maritime Claims of the Federal Rules and Civil Procedure; and

    **WHEREAS**, the Process of Maritime Attachment and Garnishment would command that

the United States Marshal, or other designated process server, attach any and all of the

Defendant's property within the District of this Court; and

    **WHEREAS**, the Court has reviewed the Verified Complaint and the Supporting

Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist:

    **NOW**, upon motion of the Plaintiff, it is hereby:

    **ORDERED**, that pursuant to Rule B of the Supplemental Rules for Certain Admiralty and

Maritime Claims, the Clerk of the Court shall issue Process of Maritime Attachment and

Garnishment against all tangible or intangible property, credits, letters of credit, bills of lading,

effects, debts and monies, electronic funds transfers, freights, sub-freights, charter hire, sub-charter

hire or any other funds or property up to the amount of **$77,379.38** belonging to, due or being

transferred to, from or for the benefit of the Defendant, including but not limited to such property as

may be held, received or transferred in Defendant's name or as may be held, received or transferred

for its benefit at, moving through, or within the possession, custody or control of banking/financial

institutions and/or other institutions or such other garnishees to be named on whom a copy of the

Process of Maritime Attachment and Garnishment may be served; and it is further

**ORDERED** that supplemental process enforcing the Court's Order may be issued by the

Clerk upon application without further Order of the Court; and it is further

**ORDERED** that following initial service by the U.S. Marshal, or other designated process

server, upon each garnishee, that supplemental service of the Process of Maritime Attachment and

Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable

electronic means, including e-mail, to each garnishee; and it is further

**ORDERED** that service on any garnishee as described above is deemed to be effective and

continuous service throughout the remainder of the day upon which service is made commencing

from the time of such service; and such service is further deemed to be effective through the end of

the next business day, provided that another service is made that day; and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may

consent, in writing, to accept service by any other means.

Dated: June 24, 2008                    **SO ORDERED:**


_____
**U. S. D. J.**

# EXHIBIT

# 3

**THE LONDON MARITIME ARBITRATORS ASSOCIATION**



# THE LMAA SMALL CLAIMS PROCEDURE

# PROCEDURE

## and COMMENTARY

(Revised 1st January 2006)

# THE LMAA SMALL CLAIMS PROCEDURE

1. **INTRODUCTION**

   These provisions shall be known as the LMAA Small Claims Procedure 2006 effective 1st January 2006. They shall apply to any dispute which parties have agreed should be referred to arbitration under this Procedure. If any such agreement refers to a monetary limit for disputes that may be so referred, such limit shall be deemed to exclude interest and costs unless the parties agree otherwise.

2. **APPOINTMENT OF ARBITRATOR**

   (a) If a dispute has arisen and the parties have agreed that it should be referred to arbitration under the Small Claims Procedure, then, unless a sole arbitrator has already been agreed on, either party may give notice to the other requiring him to join in appointing a sole arbitrator. If within fourteen days the parties have agreed on a sole arbitrator and the intended arbitrator has agreed to act, the Claimant shall within a further fourteen days send to the Respondent (with copies to the arbitrator) a letter of claim accompanied by copies of all relevant documents including experts' reports and shall also send to the arbitrator a remittance in his favour for the Small Claims fee as defined in para 3(b).

   (b) If the parties have not within fourteen days agreed on a sole arbitrator, either party may apply in writing to the Honorary Secretary, London Maritime Arbitrators Association for the appointment of a sole arbitrator by the President. Such application shall be copied to the other party and shall be accompanied by a copy of the letter of claim together with copies of all said relevant documents and a remittance for the said Small Claims fee plus £100, plus VAT where applicable, in favour of the LMAA. Where appropriate a party applying to the President should provide a concise explanation of the issues which are likely to arise and an indication as to whether any particular expertise on the part of the arbitrator is required. The President, having considered the nature of the dispute shall appoint an appropriate arbitrator and shall give notice to the parties. The LMAA. shall send to the arbitrator the letter of claim and the documents together with the said Small Claims fee, and shall retain the balance in respect of administrative expenses.

3. **THE ARBITRATOR'S FEE**

   (a) The Small Claims fee includes the appointment fee, interlocutories, a hearing not exceeding one day (if required by the arbitrator pursuant to para 5 (g)), the writing of the Award and the assessment of costs (if any). It does not include expenses, such as the hire of an arbitration room, which shall in the first instance be paid by the Claimant on demand. However if there is any challenge to jurisdiction which, or which it is suggested falls to the arbitrator to resolve, the arbitrator shall be entitled to charge on a reasonably appropriate basis for such work, his additional fees being payable in the first instance by the Claimant before he makes any award, ultimate liability for such additional fees being for the arbitrator to resolve.

   (b) The Small Claims fee shall be such standard fee as shall be fixed from time to time by the Committee of the LMAA*: VAT shall be payable where applicable. For all purposes, including time limits, payment of the Small Claims fee within 14 days of agreement being reached upon a sole arbitrator under paragraph 2(a) shall be a condition precedent to the valid commencement of proceedings under the Small Claims Procedure.

   (c) In the event of the Respondent putting forward a counterclaim which exceeds the amount of the claim an additional fixed fee in such amount (plus VAT where applicable), as shall be fixed from time to time by the Committee of the LMAA*, is payable by the Respondent. Payment of such fee within fourteen days of service of defence and counterclaim submissions shall, for all purposes including time limits, be a condition precedent to the Respondent's entitlement to bring any such counterclaim within the proceedings in question.

1

(d) If the case is settled amicably before an award has been written, the arbitrator may retain out of the Small Claims fee a sum sufficient to compensate him for services thus far rendered and any balance shall be repaid.

**4.   RIGHT OF APPEAL EXCLUDED**

The right of appeal to the Courts is excluded under this procedure.  By adopting the Small Claims Procedure the parties shall be deemed to have agreed to waive all rights of appeal. For the avoidance of doubt, this provision does not apply to any ruling by an arbitrator on his own jurisdiction.

**5.  PROCEDURE**

(a) A letter of defence and details of counterclaim (if any) accompanied in each case by copies of all relevant documents including any experts' reports shall be delivered by the Respondent to the Claimant within twenty-eight days from receipt of the letter of claim or from the date of the appointment of the arbitrator, whichever shall be the later.

(b) A letter of reply and defence to counterclaim (if any) shall be delivered by the Claimant to the Respondent within a further twenty-one days. Where an additional fee is payable under paragraph 3(c) hereof in respect of the counterclaim, the twenty-one days shall run only from receipt by the arbitrator of the additional fee. The arbitrator shall be entitled to refuse to admit evidence submitted at the stage of reply and defence to counterclaim (if any) if it should properly have been served with the letter of claim.

(c) The Respondent shall, if he so wishes, deliver to the Claimant a letter of reply to defence to any counterclaim within a further fourteen days.

(d) Any extension to the above time limits (including that for the service of a letter of claim set out in paragraph 2(a) above) must be applied for before expiry of the existing time limit.  If a party fails to serve its pleading within the time limit set, the arbitrator, on the application of the other party or of his own motion, will notify the defaulting party that unless the outstanding communication is received within a fixed period (maximum 14 days) he will proceed to the award on the basis of the submissions and documents before him to the exclusion of all others. (In the case of failure to serve a letter of claim the arbitrator shall make an award dismissing the claim.)  The time allowed by the arbitrator's notice, added to any extension of time previously agreed between the parties in respect of the same pleading, shall not in total exceed 28 days. Any pleading submitted by the defaulting party subsequent to expiry of the time limit set by the arbitrator's notice shall not be admissible.

(e) Following the service of the letter of reply, or, where there is a counterclaim, following service of the letter of reply to defence to counterclaim, the arbitrator may declare to the parties that pleadings have closed.  No further pleadings shall be considered by the arbitrator following such a declaration.

(f) Copies of all the above letters and documents shall be sent to the arbitrator and to the other party, or if the other party is acting through a solicitor or representative, to that solicitor or representative.

(g) There shall be no hearing unless, in exceptional circumstances, the arbitrator requires this.

(h) In the case of an oral hearing the arbitrator shall have power to allocate the time available (which shall be limited to one working day) between the parties in such manner that each party has an equal opportunity in which to present his case.

(i) All communications or notifications under this procedure may be by letter, telex, telefax or e-mail.

2

6.  **DISCLOSURE OF DOCUMENTS**

(a) There shall be no disclosure, but if in the opinion of the arbitrator a party has failed to produce any relevant document(s), he may order the production of such document(s) and may indicate to the party to whom the order is directed that, if without adequate explanation that party fails to produce the document(s), he may proceed on the assumption that the contents of such document(s) do not favour that party's case.

(b) The expression "relevant documents" includes all documents relevant to the dispute, whether or not favourable to the party holding them.  It includes witness statements, experts' reports and the like on which a party intends to rely, but does not include documents which are not legally disclosable.

7.  **THE AWARD**

The arbitrator will make every effort to publish the award within one month, in a documents-only case, from the date when he has received all relevant documents and submissions, or, where there is an oral hearing, from the close of the hearing.

8.  **COSTS**

The arbitrator shall assess and award costs on a commercial basis having regard to the nature of the reference.  Unless the parties otherwise agree, the amount which one party may be ordered to pay to the other in respect of legal costs (including disbursements) shall be assessed at a sum in the arbitrator's absolute discretion up to such maximum figure as shall be fixed and published from time to time by the Committee of the LMAA*. Where there is a counterclaim in respect of which an additional fixed fee is payable to the arbitrator pursuant to para (c) hereof, this amount (after striking any necessary balance between costs orders where there is more than one) shall not exceed such other maximum figure as shall be fixed and published from time to time by the Committee of the LMAA*.  No breakdowns of such costs are to be provided unless the parties agree otherwise or the arbitrator so requires, in which event they must be provided within 7 days of the service of the last pleading as in para 5(e) above or the arbitrator's direction, whichever is later.  The successful party will normally be awarded the Small Claims fee (including the fee of £100.00 payable to the LMAA. in cases where the President is requested to appoint an arbitrator) in addition to any legal costs which he has incurred (subject to the limits mentioned above), provided always that any award of costs shall be in the sole discretion of the arbitrator.

9.  **GENERAL**

The arbitrator may in any case which, in his discretion, he considers exceptional depart from or vary the above provisions as he considers appropriate, save that he shall not be entitled to vary the maximum figure which can be awarded under the Small Claims Procedure in respect of legal costs unless the parties agree otherwise.

In any case where it is determined or agreed, because of the nature and/or weight of a case, that the Small Claims Procedure is inappropriate and shall not be applicable, it shall cease to apply in its entirety.

* *The current sums, as fixed by the LMAA Committee, may be found on the LMAA website at www.lmaa.org.uk.*

## COMMENTARY ON THE LMAA SMALL CLAIMS PROCEDURE (2006)

*(Note: Attention is particularly drawn to the passages in bold type below. These indicate substantial changes to the Commentary made at the time of the 2006 Revision of the Procedure.)*

### 1.  INTRODUCTION

The Small Claims Procedure has been introduced to provide a simplified, quick and inexpensive procedure for the resolution of small claims.  It is supplementary to the Documents Only procedure contained in the Third Schedule to the LMAA Terms (2006).

It is suggested that it should be used where neither the claim nor any counterclaim exceeds the sum of $50,000 **(excluding interest and costs)**.  It is not suitable for use where there are complex issues or where there is likely to be examination of witnesses.  On the other hand, the Procedure may be suitable for handling larger claims where there is a single issue at stake.

There has been a regrettable tendency to apply the Procedure regardless of the complexity of the issues involved in a particular dispute (and occasionally, regardless of the amounts involved).  This is likely to lead to dissatisfaction with and criticism of the Procedure since the constraints on the arbitrator and the parties imposed by the limited financial remuneration for their services (which is an essential part of the Procedure) may mean that a particular dispute is not dealt with as the parties envisage.  Parties proposing to use the Procedure are therefore encouraged to consider at the outset whether it is appropriate to vary the terms of the Procedure (for example, by mutually agreeing to increase the maximum amount of recoverable costs).  The position of the arbitrator is dealt with further in the context of discretion at paragraph 9 below.

Attention is drawn to the following features:

### 2.  REFERENCE TO A SOLE ARBITRATOR

This will provide a saving both in time and expense.  It is expected and hoped that in most cases the parties will be able to agree on the sole arbitrator.  Where they cannot agree, application may be made to the L.M.A.A. and the President will then make the appointment.  There will be a charge of £100 to cover the administrative expenses.  The attention of the parties is drawn to the fact that payment of the fixed fee in full (including the additional element when the appointment is made by the President) is a condition precedent to the commencement of proceedings.  In requesting the President to make an appointment under the Procedure, the appointing party should provide as full an explanation as is practicable of the issues which he expects to arise.  He should also draw the attention of the President to the fact that particular expertise on the part of the arbitrator may be desirable (for example, engineering expertise in the case of a performance dispute).  Parties should also be aware that it is the practice of the President not to consider for appointment in a particular case any arbitrator whose name he knows has been put forward by **either** party.  The objective of this practice is to avoid any perception on the part of the other party that **a** party has secured an advantage by having the President appoint as arbitrator one of the individuals whom he has proposed.  A party asking the President to make an appointment should therefore disclose the names of the arbitrators proposed **by either** party.

**Claimants must also note that by virtue of paragraph 3(b), payment of the Small Claims fee is a condition precedent to the commencement of arbitration, including for the purposes of any time bar. Similarly under sub-paragraph (c), a counterclaim may not be brought until any relevant fee has been paid by the respondent. (Further, by paragraph 5(b), the claimant's time for responding to a counterclaim does not run until any fee relevant to the counterclaim has been paid.)**

4

3. **ARBITRATOR TO RECEIVE A FIXED FEE**

So that the parties know where they stand at an early stage it is provided that the arbitrator will receive a fixed fee. In the case of a counterclaim which exceeds the amount of the claim there is an additional fixed fee. This additional fee is charged because a counterclaim that exceeds the claim will normally involve different issues. No additional charge is made in respect of counterclaims which do not in total exceed the amount of the claim. Members of the LMAA have agreed to deal with disputes under the LMAA Small Claims Procedure as a service to the industry, though it will be appreciated that, having regard to current rates of remuneration, it may in many cases involve some financial sacrifice. Any expenses must be paid in addition.

**The amounts of these fees are determined from time to time by the LMAA Committee and will be found in the LMAA Newsletter and on the website at www.lmaa.org.uk**

**Challenges to jurisdiction can involve a great deal of work additional to that required to resolve the merits of a dispute. Accordingly it seems appropriate that such work should be paid for on a quantum meruit basis before the arbitrator resolves the challenge, and that such fees should be borne – in the first instance only – by the claimant.**

4. **EXCLUSION OF APPEAL**

Under the Arbitration Act 1996 there is no restriction on the parties to exclude the right of appeal. An agreement to arbitrate under the LMAA Small Claims Procedure will automatically be treated as an agreement to exclude the right of appeal. In view of this, while a Reasoned Award will be given, it will be expected that reasons will be relatively brief. **This exclusion does not, by virtue of the Arbitration Act 1996, apply to challenges to jurisdiction.**

5. **INFORMAL PROCEDURE**

There will be no formal pleadings and no disclosure as such. Each party will be informed of the case against him by a simple exchange of letters accompanied by copies of all relevant documents, including witness statements. A strict but reasonable timetable is imposed, and, if a party fails to comply with a final time limit set by the arbitrator, the arbitrator will proceed to his award on the basis of the documents already received. There is substituted for disclosure (a procedure frequently used to gain time) an obligation on the parties to disclose all relevant documents with their letters of claim or defence. Should a party fail in this obligation, the arbitrator is given power to order production of any missing documents and to give warning to that party that, if he fails to produce them without adequate explanation, the arbitrator may proceed on the basis that those documents do not favour that party's case. Claimants should note that any attempt to secure a tactical advantage by withholding production of evidence which should properly accompany the claim submissions until the stage of a reply may be met with a refusal on the part of the arbitrator to admit such further evidence.

6. **LEGAL REPRESENTATION**

The use of lawyers is not excluded, though it is thought that in many cases they will not be necessary. But it should be borne in mind that advice from a lawyer can often indicate to a party the strength or weakness of his case and can assist in reaching an amicable settlement; also, if settlement cannot be reached, the case may be presented by a lawyer in a more orderly and concise manner.

7. **THE AWARD**

The arbitrator will normally make his Award within one month from the date on which he has received all the papers.

5

## 8. THE COSTS

The power of an arbitrator to award costs has been retained as an important feature of London arbitration. It operates to deter spurious claims or defences and may assist in promoting an amicable settlement. The arbitrator is given power to tax or assess legal costs, but on a commercial basis. The amount recoverable will be assessed at a sum in the arbitrator's discretion not to exceed **such sum as may be fixed by the Committee of the LMAA. Where there is a counterclaim that attracts an additional fee for the arbitrator under paragraph 3(c), again this fee is fixed by the Committee from time to time.** Although the arbitrator has a discretion to vary or depart from the provisions of the Procedure in exceptional cases (see paragraph 9 below) this discretion does not extend to varying the amount of legal costs recoverable under this Procedure. It is regarded as being of fundamental importance so far as the Procedure is concerned that a party agreeing to arbitrate disputes according to the Procedure can be certain at the outset of his maximum liability in terms of costs.

**Unless otherwise agreed or requested by the arbitrator, parties are not required to present schedules of the costs claimed: the amount is to be left to the arbitrator's discretion.**

## 9. DISCRETION

It is expected that in the great majority of cases the strict timetable and provisions of the Procedure will be observed and enforced, but in exceptional cases there is discretion for the arbitrator to vary or depart from them. The success of the Procedure in promoting cost-effective arbitration in London has led to a regrettable number of cases in which disputes have been referred to arbitration according to the Procedure which are not appropriate for determination in accordance with the spirit, if not the letter, of that Procedure. Such situations can arise simply as the result of the fact that parties to a contract agreed in that contract to apply the Procedure to all disputes involving less than a certain sum of money, regardless of the nature of such disputes. In such cases the parties should be aware that the arbitrator may at the outset or at any time thereafter inform them that in his opinion the dispute referred to him cannot be dealt with satisfactorily according to the Procedure. He will then be entitled to invite the parties either to agree to an appropriate variation of the Procedure or, alternatively, to agree to his continuing to act on the basis of the LMAA Terms in force for the time being. In the event of a refusal by the parties so to agree the arbitrator shall be entitled to resign from the reference whilst retaining out of the Small Claims fee a sum sufficient to remunerate him for services thus far rendered. **An amendment to paragraph 9 makes it clear that where the Small Claims Procedure is deemed inappropriate, it shall cease to apply in all respects.**

6

# EXHIBIT

# 4



July 21, 2008

The London Maritime
Arbitrators Association

the world-wide leaders in commercial
maritime dispute resolution

## Notes On Fees

HOME
INTRODUCTION
LATEST NEWS
EVENTS
NOTES ON ARBITRATION
NOTES ON FEES
LMAA TERMS
MEMBERSHIP
LINKS
CONTACT US
FAQs

## The London Maritime Arbitrators Association

**FEES AND COSTS FROM 1ST JULY 2008**

**Introduction**

The various LMAA Terms provide:-

1. for various fees to be paid by the parties; and
2. for various limitations on the recoverable costs.

These are either set out in the terms themselves or the terms provide that they
shall be fixed from time to time by the Committee of the LMAA. Save where
otherwise stated, they do not include fees which are payable directly to the
arbitrators or mediators.

The LMAA also charges a fee for making default appointments and for providing
certificates which is fixed from time to time by the Committee of the LMAA.

**Purpose**

The purpose of this page is to summarise and publish such fees and limitations
as they stand on 1st July 2008. The terms of the rules and the FAQs should be
also be referred to.

**VAT**

Where applicable, VAT is payable in addition to such fees

**The LMAA Small Claims Procedure[1]**

**Paragraph 2(a) – Fee**

The fees and limitation on costs are those prevailing at the time of the
commencement of the arbitration.

Small claim fee payable to the arbitrator
Fixed by the Committee of the LMAA
Currently fixed at £2,000

**Paragraph 2(b) - Fee**

Small claim fee payable to the LMAA for onward transmission to the arbitrator
Fixed by the Committee of the LMAA
Currently fixed at £2,000

Plus

Administration Fee
Set out in the terms.
£150

**Paragraph 3(c) - Fee**

Additional fee payable to the arbitrator for a counterclaim which exceeds the
amount of the claim
Fixed by the Committee of the LMAA
Currently fixed at £1,250

**Paragraph 8 - Limitations on costs**

Claim
Fixed by the Committee of the LMAA
Currently fixed at a maximum of £2,750 (£2,500 for arbitrations commenced
before 1 July 2008).

Counterclaim which exceeds the amount of the claim
Fixed by the Committee of the LMAA
Currently fixed at a maximum of £3,250 for claim and counterclaim (£3,000 for
arbitrations commenced before 1 July 2008).

**The LMAA Terms - First Schedule**

**(A) Appointment Fee**

Fixed by the Committee of the LMAA
Currently fixed at £150

**(D) Booking fees**
Fixed by the Committee of the LMAA
Currently fixed at £500 per day

**The Fee for Certifying Documents**

Fixed by the Committee of the LMAA.
Currently fixed at £100

**The Fee for Default and other Appointments
(not under the LMAA Small claims procedure)**

Fixed by the Committee of the LMAA.
Currently fixed at £250

**The LMAA Mediation Terms**

**Paragraph 13A - Appointment Fee**
Set out in the terms
£250

[1] This does not apply to the LMAA SCP 1989 which has different provisions

Copyright LMAA 2003 - 08. All Rights Reserved | **Disclaimer & Legal Notice**

# EXHIBIT

# 5



eXchangeRate.com
THE CURRENCY AUTHORITY™

**XR QuickCalculator™**

U.S.A.-USD

-- Select --

**CONVERT**

FXCM
Currency Forecasts
Real Time Quotes
How to get started?
Online Forex Trading
Bookmark XR
HOT !!
Iraq Currency Info
New US $20
XR Fun Facts™
Currency Milestones
XR For Your Website™
XR 200+Calculator™
XR Quiz Challenge
XR Quiz Scoreboard
Register With XR

**CURRENCY INFO**
XR World Rates™
XR Past Rates™
XR Charts & Graphs™
XR Currency Photos™
XR Central Banks™
FAQ

**SMART TRAVELLERS**
XR Country Info™

**FOR BUSINESS**
Data Feeds

**SEARCH**
Travel & Finance

Go



**Home** >> **XR World Rates™** >> XR Quick Calculator™

Wednesday, July 23, 2008

1 GBP
🇬🇧
**Pound Sterling**

=

1.994328 USD
**US Dollar**

1 USD
🇺🇸
**US Dollar**

=

0.501422 GBP
🇬🇧
**Pound Sterling**

**Amount:** 1    From: U.K.-GBP    To: U.S.A.-USD    Convert



View **Pictures** of these currencies:
- **Pound Sterling**
- **US Dollar**



Learn more about these countries:
- 🇬🇧 **United Kingdom**
- 🇺🇸 **United States Of America**



Lookup **Travel Warnings** for these countries:
- 🇬🇧 **United Kingdom**
- 🇺🇸 **United States Of America**



View **Past Rates** for these currencies:
- **Pound Sterling**
- **US Dollar**



View **Charts & Graphs** for these currencies:
- **Pound Sterling**
- **US Dollar**



Try the **XR 200PlusCalculator™**
...more than **200** country rates!

Advertisement





**XR QuickCalculator™**

U.S.A.-USD

-- Select --

**CONVERT**

FXCM
Currency Forecasts
Real Time Quotes
How to get started?
Online Forex Trading
Bookmark XR

HOT !!
Iraq Currency Info
New US $20
XR Fun Facts™
Currency Milestones
XR For Your Website™
XR 200+Calculator™
XR Quiz Challenge
XR Quiz Scoreboard
Register With XR

CURRENCY INFO
XR World Rates™
XR Past Rates™
XR Charts & Graphs™
XR Currency Photos™
XR Central Banks™
FAQ

SMART TRAVELLERS
XR Country Info™

FOR BUSINESS
Data Feeds

SEARCH
Travel & Finance

Go

Wednesday, July 23, 2008

**Home** >> **XR World Rates™** >> **XR Quick Calculator™**

| 4900 GBP | = | 9772.208 USD |
|---|---|---|
| Pound Sterling | | US Dollar |

| 4900 USD | = | 2456.968 GBP |
|---|---|---|
| US Dollar | | Pound Sterling |

**Amount:** 4900     **From:** U.K.-GBP      Convert
                    **To:** U.S.A.-USD



View **Pictures** of these currencies:
- **Pound Sterling**
- **US Dollar**



Learn more about these countries:
- **United Kingdom**
- **United States Of America**



Lookup **Travel Warnings** for these countries:
- **United Kingdom**
- **United States Of America**



View **Past Rates** for these currencies:
- **Pound Sterling**
- **US Dollar**



View **Charts & Graphs** for these currencies:
- **Pound Sterling**
- **US Dollar**



Try the **XR 200PlusCalculator™**
...more than **200** country rates!

Advertisement

Index No. 08 Civ. 5591 XXXX (LAP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORWEGIAN BULK TRANSPORT A/S,

Plaintiff,

-against-

PIONEER NAVIGATION LTD.,

Defendant.

_____

Print name beneath

Signature (Rule 130-1.1-a)

DECLARATION

_____

Attorneys for  Defendant

*Office and Post Office Address, Telephone*

**CARDILLO & CORBETT**
**29 Broadway**
**NEW YORK, N.Y. 10006**
**212-344-0464**

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated,

_____

Attorney(s) for

___

NOTICE OF ENTRY

PLEASE take notice that the within is a *(certified)* true copy of a duly entered in the office of the clerk of the within named court on

Dated,

Yours, etc.

**CARDILLO & CORBETT**

*Office and Post Office Address*
**29 Broadway**
**NEW YORK, N.Y. 10006**

To

Attorney(s) for

___

NOTICE OF SETTLEMENT

PLEASE take notice that an order

of which the within is a true copy will be presented for settlement to the Hon.

one of the judges of the within named Court, at

on
at                M.
Dated,

Yours, etc.

**CARDILLO & CORBETT**

*Office and Post Office Address*
**29 Broadway**
**NEW YORK, N.Y. 10006**

To

Attorney(s) for